**In the Matter of BOSTON AND MAINE CORPORATION, Debtor.**

**Appeal of STATE OF NEW HAMPSHIRE.**

**No. 78–1444.**

United States Court of Appeals, First Circuit.

Argued Jan. 2, 1979.

Decided April 5, 1979.

Anthony E. Battelle, Boston, Mass., with whom John T. Collins, and Sherburne, Powers & Needham, Boston, Mass., were on brief, for appellant.

Robert G. Parks, Boston, Mass., with whom Charles W. Mulcahy, Jr., and Mulcahy & Mulcahy, Boston, Mass., were on brief, for appellees.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

In 1970 the United States District Court for the District of Massachusetts ("reorganization court") approved a petition for the reorganization of the Boston and Maine Corporation (B&M) pursuant to § 77(a) of the Bankruptcy Act, 11 U.S.C. § 205(a), and appointed trustees of its property, 11 U.S.C. § 205(c)(1). Later in 1970, upon the petition of the B&M trustees, the reorganization court under 11 U.S.C. § 205 (*o*) authorized the trustees to apply to the Interstate Commerce Commission (ICC) for certificates of public convenience and necessity permitting the abandonment of certain railroad lines in New Hampshire. In March 1972 the ICC, pursuant to the Interstate Commerce Act, 49 U.S.C. §§ 1(18) (amended 1976) and 1(20) (repealed 1976) (current version at 49 U.S.C. § 1a), issued certificates authorizing the requested abandonments. Pursuant to the ICC's certificates, service on the two lines involved herein—the Cheshire Branch, which is approximately 18.5 miles long, and the Conway Branch, which is approximately 10.6 miles long—was stopped in August 1972.

Despite approval for abandonment by both the reorganization court and the ICC, the State of New Hampshire sought to prevent the trustees from dismantling the railroad tracks on these two lines. The New Hampshire Public Utilities Commission (PUC) in December 1972 issued an order under N.H.Rev.Stat.Ann. § 365:24, prohibit-

ing the trustees from "tearing up and removing . . . any of the rail or tracks" on the two abandoned lines, "until authority for such is issued by this Commission." [1] Following the issuance of this order, the State of New Hampshire filed suit in New Hampshire Superior Court seeking injunctive relief against removal of railway properties from the abandoned lines and determination of the State's rights with respect to such lines and the railway properties thereon. The trustees appeared specially to deny the jurisdiction of the state court, whereupon the court entered a temporary restraining order enjoining such removal. According to the record before us, the state court has not yet ruled on its jurisdiction.

The trustees petitioned the reorganization court for relief from the State's actions. The trustees contended that the PUC's order and the state court's restraining order conflicted with the ICC's jurisdiction over abandonments, as well as the specific ICC certificates permitting abandonment here, and unlawfully interfered with the reorganization court's exclusive jurisdiction under § 77(a) of the Bankruptcy Act, 11 U.S.C. § 205(a).[2] On July 19, 1978 the reorganization court issued a memorandum and order in which it (1) declared the PUC's order to be "null and void and of no effect," and enjoined any attempts by New Hampshire officials to enforce the PUC's order; and (2) found the rail, track, and ties on the two abandoned lines to be personalty owned by the railroad, authorized the trustees to utilize those items on active B&M lines in New Hampshire, and restrained New Hampshire officials from prosecuting any further actions, other than those brought in the reorganization court, seeking to adjudicate the issue of jurisdiction of the State of New Hampshire over the railway properties. It is from the reorganization court's order that the State appeals.

I.

We consider first the power of the New Hampshire PUC to restrain the trustees from dismantling the rail, track, and ties on the abandoned lines. We hold the PUC was without jurisdiction by virtue of federal preemption.

The State appropriately concedes that the reorganization court and the ICC have exclusive authority over the abandonment of railroad lines. *See Colorado v. United States*, 271 U.S. 153, 164, 46 S.Ct. 452, 70 L.Ed. 878 (1926); *Village of Mantorville v. Chicago Great Western Railroad*, 8 F.Supp. 791, 794–95 (D.Minn.1934). The State argues, however, that this exclusive federal regulatory authority over abandonments does not include authority over the disposition of track and other materials on abandoned lines, so that state regulation of such disposition is permissible. The State, in so arguing, assumes that an "abandonment" as affirmatively permitted by a reorganization court and the ICC can encompass only discontinuation of rail service, and not disposition of rail property as well.

The State's view of what constitutes an abandonment is overly narrow and incom-

1. N.H.Rev.Stat.Ann. § 365:24 provides,

"Railroads, Service. No railroad shall tear up and remove or discontinue the use of any portion of its track, other than spur, industrial or storage tracks, or curtail any part of its service to the public afforded by its regular passenger trains or at its stations without notice to the commission and such notice to the public as the commission may direct. Upon complaint or upon its own motion, the commission may investigate the reasonableness of the proposed action of the railroad and, after hearing, may determine whether the proposed action is consistent with the public good, and may by order forbid the proposed removal of tracks or prescribe the service which shall thereafter be rendered. If the commission so directs, no removal of tracks or change in the service rendered by the railroad shall be made pending the decision of the commission in any such proceedings; provided, however, that such obligation to continue the service shall be operative for a period not exceeding sixty days after the close of such hearings as may be held by the commission."

2. The trustees claimed in addition that the prohibition on the use of the railroad superstructure was a taking of their property without just compensation, in violation of the fourteenth amendment. The reorganization court did not reach that issue because of its decision that the State lacked jurisdiction.

plete. Former § 1(18) of the Interstate Commerce Act, 49 U.S.C. § 1(18) (amended 1976), under which the certificates permitting the abandonment of the Cheshire and Conway branches were issued, provides,

> "no carrier by railroad subject to this chapter shall *abandon all or any portion of a line of railroad, or the operation thereof*, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity permit of such abandonment." (Emphasis added).

The highlighted language would seem to contemplate abandonment "of a line of railroad" as something distinct from abandonment of "the operation" of a line of railroad. It is interesting, and supportive of this interpretation, that § 77(*o*) of the Bankruptcy Act, 11 U.S.C. § 205(*o*), uses the term railroad "lines" when referring to railroad "property" that may be "sold" as well as abandoned. It provides in part,

> "The trustee or trustees, from time to time, shall determine *what lines or portions of lines of railroad and what other property* of the debtor, if any, should be *abandoned or sold* during the pendency of the proceedings in the interest of the debtor's estate and of ultimate reorganization but without unduly or adversely affecting the public interest, and shall [petition the court] for authority *to abandon or to sell any such property*. . . ." (Emphasis added).

Clearly under § 77(*o*), what is meant by a railroad "line" is not merely the service being provided but the physical properties and interests belonging to the debtor that constitute the line.

Thus, under the former § 1(18), we believe the ICC not only could authorize abandonment of rail service on a line, but also had power to regulate abandonment of the line itself (*i.e.*, the rail properties). These two types of abandonments are differentiated even more explicitly in the current provision of the Interstate Commerce Act regarding abandonments, 49 U.S.C. § 1a, which speaks in terms of both "abandonment" of lines of railroad and "discontinuance" of the operation of rail service over such lines, apparently intending to distinguish the two. *See also* 45 U.S.C. § 744(b).

The jurisdiction of the ICC to permit disposition of railroad property on abandoned lines in addition to discontinuance of service is consistent with the Commission's role in railroad abandonments, a role which cannot be too narrowly confined. The Commission exercises a "fostering guardianship and control" over the nation's railroad systems, and is broadly empowered

> "to supervise their issue of securities, their car supply and distribution, their joint use of terminals, their construction of new lines, their abandonment of old lines, and by a proper division of joint rates, and by fixing adequate rates for interstate commerce, and in case of discrimination, for intrastate commerce, to secure a fair return upon the properties of the carriers engaged."

*Dayton-Goose Creek Railway v. United States*, 263 U.S. 456, 478, 44 S.Ct. 169, 172, 68 L.Ed. 388 (1924). The financial condition of railroads is of central concern to the Commission, because it directly impacts upon their ability to meet their federal duty to provide rail service in the public interest. Thus, in deciding whether or not to authorize an abandonment, the Commission properly considers the financial consequences to the railroad of abandonment *vel non*. *See Colorado v. United States*, 271 U.S. at 162–63, 46 S.Ct. 452. The salvage of rails and other materials from an abandoned line, either for use on operating lines or for sale, can provide a significant economic benefit to a railroad. *In re Penn Central Transportation Co.*, 366 F.Supp. 62, 63 (E.D.Pa.1973). Given the ICC's appropriate concern with the economic performance of railroads, its authority to permit abandonment of a railroad line as such, not just discontinuance of service, and its power to condition abandonment on "such terms and conditions as in its judgment the public convenience and necessity may require," 49 U.S.C. § 1(20) (repealed 1976); *see Reed v. Meserve*, 487 F.2d 646, 649 (1st Cir. 1973), we believe it was

within the Commission's power to regulate and authorize the dismantling of the rail, track, and ties on the Cheshire and Conway branches.

In granting the trustees permission to apply to the ICC for certificates of public convenience and necessity allowing abandonment, the reorganization court also authorized the trustees, upon issuance of the certificates, to "salvage such material as may profitably be recovered and . . . to sell or otherwise dispose of any property included in the lines or portions of lines authorized to be abandoned." The ICC thereafter, in considering whether abandonment was appropriate, extensively evaluated the salvage value of the rail and ties in determining the financial benefit of the abandonments. It also considered New Hampshire's request that, if abandonment were authorized, the actual dismantlement of the branches and sale of the rights-of-way be postponed for one year to afford the State and local governments an opportunity to purchase all or part of the lines for public use. The Commission refused the request because, in the hearing examiner's words, "to require [the railroad] to maintain its facilities intact for the period of a year after it has been determined that abandonment is warranted, is not reasonable, particularly in the absence of any concrete evidence that they would be purchased."[3] From these actions, it seems clear that the Commission meant by its certificates to permit the trustees not only to discontinue service on the two branches but to remove the rail, track, and ties therefrom. This latter aspect was, as we have stated, within the Commission's regulatory authority under 49 U.S.C. §§ 1(18) (amended 1976) and 1(20) (repealed 1976). As the order of the New Hampshire PUC was in conflict with the ICC's prior action, the reorganization court properly ruled that the State's order was void.

## II.

We consider next the reorganization court's authorization that the trustees dismantle the rail, track, and ties. This issue entails two major questions. One is whether the court erred in adjudicating and upholding the trustees' title to these properties. The other issue is whether the reorganization court's decision to allow the rail, track, and ties to be removed is appropriate in light of the competing interests involved.

### A.

With respect to the trustees' title, the Bankruptcy Act has conferred upon a reorganization court exclusive jurisdiction of the railroad and "its property wherever located." 11 U.S.C. § 205(a). The court's summary jurisdiction includes the adjudication of conflicting claims of title to all property, including the tracks and track material, which the railroad possessed at the time it filed its reorganization petition. *Thompson v. Magnolia Petroleum Co.*, 309 U.S. 478, 481–82, 60 S.Ct. 628, 84 L.Ed. 876 (1940); *see Ex parte Baldwin*, 291 U.S. 610, 615–16, 54 S.Ct. 551, 78 L.Ed. 1020 (1934); *Isaacs v. Hobbs Tie & Timber Co.*, 282 U.S. 734, 737–38, 51 S.Ct. 270, 75 L.Ed. 645 (1931). When exercising that jurisdiction, however, the court may, "where the interests of the estate and the parties will best be served, . . . consent to submission to State courts of particular controversies involving unsettled questions of State property law" which arise in the course of the reorganization proceedings. *Thompson v. Magnolia Petroleum Co.*, 309 U.S. at 483, 60 S.Ct. at 630. The State contends that the reorganization court should have submitted the question of title to the track and track materials involved herein to the New Hampshire courts. We review the reorganization court's decision to decide the issue itself under an abuse of discretion standard. *See id.* at 483 n. 8, 60 S.Ct. 628.

According to the parties' stipulation, the railroad does not own in fee all of the land underlying the abandoned lines. Much of the land underlying the railroad's rights of way is owned in fee by other private par-

3. Instead, the Commission gave the State sixty days from the issuance of the certificate to purchase the branches at a price not less than the fair salvage value.

ties, with easements held by the State in many cases, or is owned in fee by the State. The State concedes that the track and track materials located on the land owned by the railroad also is owned thereby. It argues that ownership of the balance of the track and track materials, however, presents an unsettled issue of New Hampshire property law which under *Thompson v. Magnolia Petroleum Co.* should be referred to a New Hampshire court, not decided by the reorganization court. It claims that a New Hampshire court might well hold that the tracks and track materials are part of the underlying realty and hence not owned by the railroad, contrary to the reorganization court's disposition. The State contends in addition that were the track and track materials deemed part of the realty, the problem of determining the ownership of the various parcels of land would involve unsettled property law questions which should be decided by a New Hampshire court as well.

We find the State's arguments unpersuasive. The absence of New Hampshire authority directly on point does not necessarily mean the law is so unsettled as to require submission of the issue to the New Hampshire courts. New Hampshire law seems clear that trade fixtures retain their character as personalty absent an intention by their owner to make them a permanent part of the realty. *Ferguson v. O'Brien*, 76 N.H. 192, 81 A. 479 (1911); *Dana v. Burke*, 62 N.H. 627 (1883). From that rule it may be reasonably inferred that New Hampshire courts would conform, on the specific issue presented here, to the rule prevalent elsewhere regarding tracks and other structures placed by a railroad on the land of another under an easement or other similar right: that, absent a clear intention otherwise, such items are trade fixtures which are not intended to become part of the realty and which the railroad may remove. *Wiggins Ferry Co. v. Ohio and Mississippi Railway*, 142 U.S. 396, 415–16, 12 S.Ct. 188, 35 L.Ed. 1055 (1892); *Baetjer v. Garzot*, 136 F.2d 453, 456 (1st Cir. 1943); *St. Louis-San Francisco Railway v. White*, 199 Ark. 56, 132 S.W.2d 807 (1939); *Helena & Livingston Smelting & Reduction Co. v. Northern Pacific Railway*, 62 Mont. 281, 205 P. 224, 229–30 (1922); *American Steel & Iron Co. v. Taft*, 109 Vt. 469, 472, 199 A. 261, 262–63 (1938). The State has cited no authority disputing that this is the generally accepted rule regarding railroad superstructure on the land of another. The State relies instead on the case of *Haven v. Emery*, 33 N.H. 66 (1856), which it reads as indicating some uncertainty as to New Hampshire's acceptance of the general rule. That case, however, does not support the State's proposition. In *Haven v. Emery*, the New Hampshire Supreme Court ruled that railroad tracks do not by virtue of their annexation to the roadbed necessarily become part of the realty, but that the intention of the parties determines whether the tracks remain personalty or become part of the realty. By showing intent to be determinative under New Hampshire law, *Haven v. Emery* reinforces the reorganization court's conclusion that the New Hampshire law regarding railroad superstructure follows the general rule. We accordingly conclude that the issue of whether the track and track materials are realty or personalty is not such an unsettled question of property law as to have required the reorganization court to refrain from passing on it.

Applying the general rule, the reorganization court found no intention by the railroad to relinquish ownership of the tracks and track materials and to make them part of the underlying realty. Its findings in this regard are not clearly erroneous. Fed.R.Civ.P. 52. There is no evidence of any specific expression of such an intention. The materials which the trustees seek to remove from the abandoned lines are, therefore, personal property to which they hold title. Ownership of the parcels underlying the lines need not be decided, as it is immaterial to the removal question.

B.

The State argues that the reorganization court's decision to permit dismantlement of the rail, track, and ties on the abandoned lines was inappropriate in light

of the public interest in maintaining the lines intact. As private individuals, the members of this court might well agree that, in these times, to destroy a transportation corridor capable of moving freight and individuals with less use of energy than other means is short-sighted. But our role is limited to that of judges, not would-be transportation experts. Under applicable legal standards, the State is too late in tendering its policy arguments against dismantlement. These arguments go to the merits of issues decided long ago by the reorganization court and the ICC. When the reorganization court first authorized the trustees "upon issuance of a proper certificate by the [ICC] to abandon the described lines and portions of lines and salvage such material as may profitably be recovered," New Hampshire did not seek judicial review of this order, which was appealable, *see* 11 U.S.C. §§ 47, 48(a), and 205(*o*). Subsequently, in proceedings in which the State participated, the ICC considered the trustees' application for abandonment and concluded that abandonment of the lines should be allowed. The ICC's issuance of certificates, which we have construed as authorizing removal of the rail, track, and ties as well as discontinuance of service, was not appealed by the State. *Compare Maine Department of Transportation v. ICC,* 587 F.2d 541 (1st Cir. 1978).

Moreover, even if the policy arguments could properly be made at this time and in this proceeding, we would be unable to provide relief. Assuming, as the State argues, that the Regional Rail Reorganization Act of 1973, 45 U.S.C. §§ 701–94, and the Railroad Revitalization and Regulatory Reform Act of 1976, 45 U.S.C. §§ 801–54, reflect a federal policy in favor of reinstatement of rail service on abandoned lines, it is difficult to see how these legislative enactments can affect the reorganization court's and ICC's authorization of abandonment, made in 1970 and 1972. New Hampshire cites no provision of these subsequent enactments, or any administrative action pursuant thereto, which supersedes or nullifies the certificates of abandonment. There has been no showing that either the ICC or the reorganization court, in authorizing abandonment of the Cheshire and Conway branches, neglected duties under the relevant statutes.

In any event, New Hampshire's position is a most difficult one to maintain. New Hampshire would require the trustees to keep the properties on the abandoned lines in place, without compensation, so that the State may purchase the lines intact at some future—and unspecified—date. The State of New Hampshire made no offer to purchase the lines during the sixty days which the ICC thought reasonable for that purpose, *see* note 3 *supra,* nor has it done so in the more than six years thereafter. Even in its brief before this court, New Hampshire does not express a present willingness to purchase the lines. It makes only the following representation:

> "[T]he State of New Hampshire has submitted its Rail Plan to the Federal Railway Administration and has applied for federal funds to acquire other lines in the State of New Hampshire . . . . The State intends to acquire, ultimately, whatever rights are determined to be owned by the Trustees in the rail properties involved in this dispute, subject to the approval of the State's Rail Plan and the availability of federal and state funds. The extent of funds available for these purposes is not yet certain."

It seems doubtful—although we do not purport to rule—that an indefinite, uncompensated restriction on a railroad's use of its property on abandoned lines while a state seeks money with which to purchase them, would be contemplated by any federal statute. *Compare* 49 U.S.C. §§ 1a(6)(a) and 1a(10); 45 U.S.C. § 744(b)(2). The constitutional prohibition against taking of private property for public use, without just compensation, might also be implicated by a requirement that the trustees hold the lines intact but idle for an indefinite period, without payment. so that the State may ultimately purchase the lines if it can come up with the necessary money—although, again, we need not rule on the subject.

As a final matter, we note that the reorganization court was within the scope of its authority in enjoining New Hampshire officials from further efforts to enforce the PUC's order or to adjudicate in state court the issue of New Hampshire's control over the railroad properties on the abandoned lines. Such actions by the state officials, if successful, would interfere with the reorganization court's determination that the trustees may remove the rail, track, and ties from the lines for use elsewhere. The reorganization court has power to prevent such interference by equitable means. *See* 11 U.S.C. §§ 11(a)(15) and 205(a); *Boston Terminal Co. v. Mutual Savings Bank Group Committee,* 127 F.2d 707, 711 (1st Cir. 1942); *cf. Ex parte Baldwin,* 291 U.S. 610, 54 S.Ct. 551, 78 L.Ed. 1020 (1934).

*Affirmed.*