**CARTERSVILLE ELEVATOR, INC., Community Elevators, Inc., Farms Co-op Society, Farmers Community Co-op Elevator, Farmers Community Co-op, Inc., and Four County Agricultural Supply, Inc., Petitioners,**

v.

**INTERSTATE COMMERCE COMMISSION, Respondents,**

and

**Chicago and North Western Transportation Company, Intervening Respondent.**

No. 82–2276.

United States Court of Appeals, Eighth Circuit.

Submitted June 16, 1983.

Decided Jan. 3, 1984.

Michael P. Casey, St. Louis, Mo., Thomas F. McFarland, Jr., Chicago, Ill., for petitioners; Lewis, Rice, Tucker, Allen & Chubb, St. Louis, Mo., Belnap, Spencer & McFarland, Chicago, Ill., of counsel.

Robert T. Opal, Chicago, Ill., for intervening respondent Chicago and North Western Transp. Co.

John Broadley, Gen. Counsel, Henri F. Rush, Associate Gen. Counsel, Louis Mackall, Atty., I.C.C., Washington, D.C., for I.C.C.

Before BRIGHT, JOHN R. GIBSON, and FAGG, Circuit Judges.

JOHN R. GIBSON, Circuit Judge.

The Interstate Commerce Commission approved the abandonment of 35.6 miles of railroad line between Mason City and Kesley, Iowa (Mason City line) operated by the Chicago and North Western Transportation Company (CNW). Six shippers who used the line to ship or receive grain, fertilizer and agricultural supplies opposed the abandonment before the ICC and petitioned this court for judicial review of the ICC's decision. The shippers claim that the ICC's use of opportunity costs in approving the abandonment of the Mason City line violated its own regulation and its statutory mandate. We affirm the decision of the ICC.

## I.

The ICC is authorized to approve the abandonment of rail lines if "the present or future public convenience and necessity require or permit" the abandonment. 49 U.S.C. § 10903(a)(Supp. V. 1981). This standard requires that the ICC balance the local benefit of continued operation of a rail line with the present and future burden its operation imposes on interstate commerce. *Colorado v. United States,* 271 U.S. 153, 46 S.Ct. 452, 70 L.Ed. 878 (1925); *City of Cherokee v. I.C.C.,* 641 F.2d 1220 (8th Cir.1981), *cert. denied,* 454 U.S. 892, 102 S.Ct. 388, 70 L.Ed.2d 206. The profitability of a rail line determines the burden its operation places on interstate commerce. *Colorado v. United States,* 271 U.S. at 169, 46 S.Ct. at 456. While profitability has traditionally been determined by comparing the revenues generated by the line with the costs that would be avoided if abandonment were permitted,[1] *Missouri Pacific R.R. v. United States,* 625 F.2d 178 (8th Cir.1980), the ICC in 1979 served notice that it would begin to consider opportunity costs as an additional factor in determining the burden on interstate commerce. *Abandonment of Railroad Lines-Use of Opportunity Costs,* 360 I.C.C. 571 (1979), *aff'd, Farmland Industries, Inc. v. United States,* 642 F.2d 208 (7th Cir.1981) (Opportunity Costs). Opportunity costs are defined as "the real economic loss an entity experiences when it must forego some other, more profitable use of its resources." *Id.* at 571. They are computed by multiplying the net liquidation value of the line by

---

1. Avoidable costs are defined as

    (1) all expenses that would be incurred by a rail carrier in providing transportation that would not be incurred if the railroad line over which the transportation was provided were abandoned or if the transportation were discontinued. Expenses include cash inflows foregone and cash outflows incurred by the rail carrier as a result of not abandoning or discontinuing the transportation. Cash inflows foregone and cash outflows incurred include—

    (A) working capital and required capital expenditure;
    (B) expenditures to eliminate deferred maintenance;
    (C) the current cost of freight cars, locomotives, and other equipment; and
    (D) the foregone tax benefits from not retiring properties from rail service and other effects of applicable Federal and State income taxes.

49 U.S.C. § 10905(a)(1) (Supp. V. 1981). *See also* 49 C.F.R. § 1152.32 (1982).

an adequate rate of return. *Texas and Pacific Ry. Abandonment,* 363 I.C.C. 666, 671 (1980) (Rock House). The ICC has adopted a rate of return equivalent to the railroad industry's inflation-adjusted cost of capital. *Illinois Central Gulf R.R. Abandonment,* 363 I.C.C. 729, 733 (1980), *aff'd sub nom., Ballard County Rail Users v. I.C.C.,* 665 F.2d 1043 (6th Cir.1981) (unpublished opinion) (Kevil).

On September 8, 1981, CNW filed an application with the ICC seeking authority to abandon the Mason City line. On February 20, 1982, an ICC Review Board denied the application. On appeal, the full Commission reversed the Review Board and granted the abandonment. *Chicago and North Western Abandonment,* 366 I.C.C. 373 (1982) (CNW Abandonment). In granting the abandonment, the ICC determined that the Mason City line generated profits of $235,874.00 in the base year [2] ($823,682.00 in revenues minus $587,808.00 in avoidable costs). Normalized maintenance expenses [3] of $176,678.00 reduced the line's profit to $59,196.00. The ICC then determined that CNW suffered opportunity costs of $202,-743.00 in operating the line.[4] This resulted in a "net economic loss" to CNW of $143,-547.00. With the possibility of increased future revenues remote, the ICC concluded that continued operation of the Mason City line would burden interstate commerce.

The ICC then considered the burden abandonment would impose on local communities and shippers. The shippers claimed abandonment would result in greater reliance on motor carrier transportation, thus increasing costs and inconvenience. However, they offered no information concerning the amount of traffic they shipped by rail or the extent to which abandonment would increase their costs. Moreover, interrogatories answered by three of the shippers indicated that they were already making substantial use of motor carriers [5] and that a sufficient number of such carriers were available to handle the increased business resulting from abandonment. The ICC concluded that the slight burden abandonment would impose on local interests did not outweigh the burden on interstate commerce, and thus approved the abandonment. A petition to reopen the matter was denied. *Chicago and Northwestern Abandonment,* No. AB–1 (Sub. No. 119) (August 20, 1982).

The shippers raise three objections concerning the ICC's use of opportunity costs in permitting the abandonment of the Mason City line. First, they claim that the ICC violated its own definition of opportunity costs by failing to require CNW to reinvest the assets freed by abandonment in a specific use, rail or nonrail, which will realize the 10.2% rate of return upon which opportunity costs were calculated. Second, the shippers contend that opportunity costs are not a burden on interstate commerce within the meaning of the *Colorado v. United States, supra,* balancing test unless the assets freed by abandonment are reinvested in an alternative rail use. Third, the shippers claim that the ICC's use of opportunity costs without regard to the post-abandonment use of the assets will result in wholesale abandonment of thousands of miles of

2. May 1, 1980 through April 30, 1981.

3. Normalized maintenance is "the amount needed for economic and efficient operation over the long term. Actual maintenance is the minimum expenditure necessary for safe, short term operation." *CNW Abandonment,* 366 I.C.C. at 377. The ICC considers normalized maintenance in abandonment proceedings because the deferral of such necessary expenses may distort a line's profitability. *See International Minerals & Chemical Corp. v. I.C.C.,* 656 F.2d 251 (7th Cir.1981).

4. This figure was arrived at by multiplying the line's net liquidation value ($1,987,679.00) by an adequate rate of return (10.2%, the railroad industry's inflation-adjusted cost of capital).

5. The ICC specifically referred to one shipper, Community Elevators, Inc., in its decision. Besides shipping all of its oats and most of its liquid fertilizer by truck, Community Elevators also shipped the following quantities of corn by truck:

| Year | Truck Shipment | Total Shipment |
|------|----------------|----------------|
| 1979 | 2,041,122 bushels | 2,386,270 bushels |
| 1980 | 1,064,372 bushels | 1,761,661 bushels |
| 1981 | 711,111 bushels | 973,736 bushels |

*CNW Abandonment,* 366 I.C.C. at 379.

railroad lines, which in turn will frustrate national transportation rail policy "to ensure the ... continuation of a sound rail transportation system ... to meet the needs of the public and the national defense." 49 U.S.C. § 10101a(4)(Supp. V. 1981).

## II.

■ A threshold issue is presented. CNW argues that this court lacks jurisdiction to review the ICC order granting abandonment because the shippers' petition for judicial review was not filed in a timely manner. Under 28 U.S.C. § 2344 (1976), petitions for judicial review of agency decisions must be filed within 60 days of the date of entry of a final order. Timeliness of the petition is a jurisdictional requirement that cannot be modified or waived by this court. *Chem-Haulers, Inc. v. United States,* 536 F.2d 610 (5th Cir.1976); Fed.R. App.P. 26(b).

■ The Review Board served its order denying CNW's initial application for abandonment on February 19, 1982. The order of the full Commission reversing the Review Board and granting the abandonment was served on May 21, 1982. The order denying shippers' petition to reopen was served on August 26, 1982. The petition seeking judicial review was filed on October 22, 1982; this was 154 days after the order granting abandonment and 57 days after the order denying the petition to reopen. Thus, the petition for judicial review is timely if the petition to reopen tolled the 60-day period until August 26.

The two methods of administrative appeal from an ICC decision are petitions to reopen administratively final actions, 49 C.F.R. § 1115.4, § 1152.25(e)(6) (1982), and discretionary appeals, *id.* at § 1115.3(a), § 1152.25(e)(2)(ii). Petitions to reopen, because they may be filed at any time after a final order, have not been permitted to toll

the 60-day period for filing a petition for judicial review. *Provisioners Frozen Express, Inc. v. I.C.C.,* 536 F.2d 1303 (9th Cir. 1976). To allow a petition filed years after an initial decision to toll the 60-day period would allow parties to endlessly preserve judicial review. Discretionary appeals, because they must be filed within 20 days of a final order, may operate to toll the 60-day period. *B.J. McAdams v. I.C.C.,* 551 F.2d 1112 (8th Cir.1977). In *B.J. McAdams,* a carrier filed a discretionary appeal from the ICC's denial of operating authority on the grounds that the issues were of general transportation importance (GTI). The GTI appeal was held to toll the 60-day period. Crucial to our holding was that a GTI appeal must be filed within 15 days of service of a final order, thus avoiding the "specter of potential delay." *Id.,* 551 F.2d at 1115 n. 2.

The shippers filed their appeal from the ICC's May 21 decision as a discretionary appeal. They complied with the time limit imposed on filing discretionary appeals by receiving a 10-day extension and filing within 30 days of the May 21 order. The ICC, however, *sua sponte* classified the appeal as a petition to reopen.[6] *Chicago and Northwestern Abandonment,* No. AB–1 (Sub. No. 119) 1, n. 2 (August 20, 1982). Under the unique circumstance of the shippers' timely filing, allowing the petition to reopen to toll the 60-day period will not intolerably prolong the availability of judicial review. *Cf. B.J. McAdams, supra.* Consequently, we conclude that the shippers' petition to reopen tolled the 60-day period until August 26. The petition for judicial review, filed 57 days later, was timely.

## III.

The nature of the shippers' claims requires that we review the ICC's decision under two separate standards.

---

**6.** The ICC took this action because the shippers filed their appeal pursuant to the ICC's general appeal procedures which are not applicable to abandonment proceedings. 49 C.F.R. § 1115.-1(a) (1982). Appeals from abandonment decisions are governed by separate guidelines. *Id.* at § 1152.25(e). Even if the shippers had properly filed, their appeal did not qualify as a discretionary appeal. Discretionary appeals are available only if taken from "the initial decision." *Id.* at § 1152.25(e)(3). The Review Board made the initial decision in this case, and the shippers were appealing the subsequent decision of the full Commission.

First, we must determine if the ICC's action was "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." Administrative Procedure Act § 10(e), 5 U.S.C. § 706(2)(C) (1976). While an agency interpretation of its statutory mandate is not controlling, *Volkswagenwerk v. FMC,* 390 U.S. 261, 88 S.Ct. 929, 19 L.Ed.2d 1090 (1968), this standard requires the reviewing court to give "great deference to the interpretation given the statute by the officers or agency charged with its administration," *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1959), and to affirm the agency construction if it has a "reasonable basis in law," *NLRB v. Hearst Publications,* 322 U.S. 111, 131, 64 S.Ct. 851, 860, 88 L.Ed. 1170 (1944). This deference is even greater when, as with the shippers' first claim, a court is reviewing an agency's interpretation of its own regulation. *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945); *Rural Electrification Admin. v. Northern States Power Co.,* 373 F.2d 686 (8th Cir.1967), *cert. denied,* 387 U.S. 945, 87 S.Ct. 2079, 18 L.Ed.2d 1332.

If we determine that the ICC's actions comport with their own regulations and statutory authority, we must then determine if the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Administrative Procedure Act § 10(e), 5 U.S.C. § 706(2)(A) (1976). This standard is also a narrow one. We must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment," *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971), and determine if the agency has articulated a "rational connection between the facts found and the choice made." *Burlington Truck Lines v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962). This court "cannot substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Assn. v. State Farm Mutual,* —— U.S. ——, ——, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443, 458 (1983).

■ The shippers' first claim is that the language "some other, more profitable use" in the ICC's definition of opportunity costs requires that the freed assets be reinvested in an actual use, rail or nonrail, which generates the 10.2% rate of return upon which opportunity costs are measured. Beyond their interpretation of the ICC's definition, the shippers demonstrate no basis for such a requirement. The ICC's statement of policy change authorizing the use of opportunity costs fails to indicate that a specific return must be achieved. *Opportunity Costs, supra.* Subsequent ICC decisions have likewise failed to condition abandonment on the railroad realizing a specific rate of return. *See, e.g., Wabash R.R. and Norfolk and Western Ry. Abandonment,* 366 I.C.C. 820 (1982); *Louisville and Nashville R.R. Abandonment,* 366 I.C.C. 1 (1981); *Rock House, supra; Kevil, supra.* Any such requirement would entail such extensive regulation and monitoring that the ICC's silence is a clear indication that it was not contemplated. The absence of support for the shippers' position and our great deference to the ICC's interpretation requires that we reject the shippers' claim.

■ The shippers' second and third claims allege that the ICC violated its judicially-interpreted statutory mandate by considering CNW's opportunity costs without requiring that the freed assets be reinvested in an alternative rail use. Without this reinvestment requirement, the shippers claim that opportunity costs cannot be considered a burden on interstate commerce, *Colorado v. United States, supra,* and that national rail transportation policy to maintain a "sound rail transportation system" will be frustrated, 49 U.S.C. § 10101a(4).

This is not the first time the courts have considered the issue of nonrail use of assets in opportunity cost analysis. First, in *Farmland Industries, Inc. v. United States,* 642 F.2d 208 (7th Cir.1981), *aff'd, Opportunity Costs, supra,* the ICC's policy statement announcing future use of opportunity costs was upheld. This policy statement specifically approved nonrail uses, stating that

"[s]uch evidence [of opportunity costs] may include the costs incurred in keeping assets tied up in less profitable operations as opposed to more profitable uses elsewhere, *including nonrail uses." Opportunity Costs,* 360 I.C.C. at 577 (emphasis added). Second, in *Missouri Pacific R.R. v. United States,* 625 F.2d 178 (8th Cir.1980) this court held that the opportunity costs are a valid consideration in pre-1979 abandonment proceedings. The shippers claim that Missouri Pacific's identification of five other locations where it could devote the freed assets removed the nonrail use issue from our holding. However, this court cited with approval the language in *In re Boston and Maine Corp.,* 596 F.2d 2 (1st Cir.1979), where the First Circuit indicated that "[t]he salvage of rails and other materials from an abandoned line, *either for use on operating lines or for sale,* can provide a significant economic benefit to a railroad. *Id.* at 6 (emphasis added). Third, in a decision addressing the identical issue before this court, the Seventh Circuit decided the question it had reserved in *Illinois v. United States,* 666 F.2d 1066 (7th Cir.1981), and upheld the nonrail use of assets. *Simmons v. United States,* 698 F.2d 888 (7th Cir. 1983). Language contained in *Illinois v. United States, supra,* cited by the shippers in support of their position, was construed in *Simmons* not to require reinvestment of freed assets in alternative rail uses. *Simmons,* 698 F.2d at 898.

Beyond past judicial authorization, we are convinced that the ICC's statutory mandate permits the nonrail use of assets in abandonments justified on the basis of opportunity costs. The statute directs the ICC to approve abandonment when re-quired by "public convenience and necessity." 49 U.S.C. § 10903(a). With the exception of considering the impact on rural and community development,[7] Congress has not defined this standard. The Supreme Court interpreted "public convenience and necessity" as requiring the ICC to balance the line's benefit to local interests with the burden its operation imposes on interstate commerce. *Colorado v. United States, supra. See also I.C.C. v. Railway Labor Executives Ass'n,* 315 U.S. 373, 376–77, 62 S.Ct. 717, 719–20, 86 L.Ed. 904 (1942) (standard must be given a broad interpretation consistent with providing the public with an "efficient and nationally integrated railroad system"). In 1979, the ICC proposed that opportunity costs be considered as an additional factor in determining a line's burden on interstate commerce. After notice and comment, the ICC adopted the proposed change, concluding that "opportunity costs are a real, and, in some cases, very significant factor in determining whether the line at issue is imposing a burden on interstate commerce." *Opportunity Costs,* 360 I.C.C. at 577. Comments received by the ICC during this rulemaking process proposed the same reinvestment limitation advocated by the shippers. *Id.* at 574. The ICC rejected this limitation, emphasizing the importance of permitting railroads "to achieve an overall rate of return sufficient to attract investment capital." *Id.* at 577. The ICC concluded that a railroad's failure to generate an adequate rate of return results in a "hidden form of cross-subsidization," whereby higher rates must be earned on some lines to compensate for losses suffered on other lines not earning the cost of capital.[8] *Id.*

---

**7.** This consideration was mandated by the Railroad Revitilization and Regulatory Reform Act of 1976, (4R Act) § 802, Pub.L. 94–210, 90 Stat. 31, 128 (codified at 49 U.S.C. § 10903(a) (Supp. V 1981)).

**8.** In the context of rate-setting, the ICC agreed with the following statement of Professor William J. Baumol concerning the importance of allowing rail carriers to achieve a rate of return equal to their cost of capital:

'[A]ny I.C.C. decision which forecloses the opportunity to earn a compensatory rate of return on the railroads' capital must guarantee deterioration of plant and equipment, neglect of replacement and opportunities for modernization, and, more generally, withdrawal in one way or another of railroad services which the market would otherwise show to be valued by customers at amounts that exceed their costs.'

*Standards for Railroad Revenue Adequacy,* 364 I.C.C. 803, 809–10 (1981), *aff'd, Bessemer and Lake Erie R.R. v. I.C.C.,* 691 F.2d 1104 (3d

■ The ICC's conclusion that a railroad's inability to achieve an adequate rate of return burdens interstate commerce was echoed by congressional analysis which accompanied passage of the Staggers Rail Act of 1980, Pub.L. No. 96–448, 94 Stat. 1895 (codified as amended in scattered sections of 49 U.S.C. §§ 10101–11917):

> 30 per cent of the 'rail business' is being handled by financially weak rail carriers. This adversely affects all rail carriers because about 70 per cent of all rail traffic is interchanged between two or more railroads.
>
> ... This interdependence will mean that service will be no better than the quality of service offered by the weakest carrier in the interchange.

H.R.Rep. No. 1035, 96th Cong., 2d Sess. 112–13, *reprinted in* 1980(4) U.S.Code Cong. & Ad.News 3978, 4056–57. Congress also indicated that the railroads are facing a serious capital shortfall, finding that "[r]ailroad industry earnings are the lowest of any transportation mode and are insufficient to generate funds for necessary capital improvement. By 1985, there will be a capital shortfall of between $16 billion and $20 billion." *Id.* at 3998. While the Staggers Act did not alter the "public convenience and necessity" standard, the ICC's conclusion that opportunity cost losses burden interstate commerce is in harmony with current congressional rail policy. As such, we cannot say that the ICC's actions reflect an unreasonable interpretation of that standard. The shippers' second claim must therefore be rejected.

In adopting opportunity cost analysis, the ICC has emphasized that the traditional balancing test mandated by *Colorado v. United States, supra,* remains intact. The benefit to local shippers and communities of a line's continued operation remains a critical factor in the abandonment decision.

Opportunity costs are simply "one of the factors to be considered in determining whether the public convenience and necessity permits abandonment," and are designed to give a "more complete picture of the burden to the carrier." *Rock House,* 366 I.C.C. at 677. The ICC recently commented that

> [t]he Commission has stated that opportunity cost is just one of the factors that must be taken into consideration in determining whether abandonment is justified. Merely because a railroad could earn greater revenue by investing its assets elsewhere does not mean that public convenience and necessity requires abandonment.

*Burlington Northern R.R. Abandonment,* No. AB–6 (Sub. No. 104F) (Jan. 29, 1982). This continued adherence to the balancing test insures that the ICC's adoption of opportunity cost analysis will not compromise the maintenance of a "sound rail transportation system ... [which] meet[s] the needs of the public . . . ." 49 U.S.C. § 10101a (4). For this reason, the shippers' third claim must be dismissed.[9]

■ Finally, we must review the ICC's decision to determine if it was arbitrary and capricious. In making its decision, the ICC examined the revenues, avoidable costs, normalized maintenance expenses, future profitability and opportunity costs of the Mason City line. These figures revealed that the line was operating at an economic loss which burdened interstate commerce. The shippers failed to provide any evidence as to increased costs or inconveniences they would suffer if abandonment were permitted, and "d[id] not even claim that they would be seriously harmed." *CNW Abandonment,* 366 I.C.C. at 380. The ICC concluded that "we cannot find that the potential harm to protestants outweigh the bur-

Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 2463, 77 L.Ed.2d 1340.

**9.** We also observe that meeting the needs of the public is not the ICC's sole objective in regulating the railroad industry. Congressional policy also mandates the ICC "to promote a safe and efficient rail transportation system by

allowing rail carriers to earn adequate revenues" and "to foster sound economic conditions in transportation and to ensure effective competition and coordination between rail carriers and other modes." 49 U.S.C. § 10101a(3), (5) (Supp. V 1981). Opportunity cost analysis is consistent with these goals.

den on CNW." *Id.* Having considered all relevant factors in a rational manner, we cannot conclude that the ICC's decision was arbitrary or capricious.

Cognizant that "flexibility and adaptability to changing needs and patterns of transportation is an essential part of the office of a regulatory agency," *American Trucking Assn's. v. Atchison, T., & S.F. Ry.,* 387 U.S. 397, 416, 87 S.Ct. 1608, 1618, 18 L.Ed.2d 847 (1960), we conclude that the ICC's use of opportunity costs in the Mason City abandonment proceeding without regard to the subsequent use of the freed assets was neither beyond its statutory mandate nor arbitrary and capricious. Accordingly, the petition for review is denied.

FAGG, Circuit Judge, dissenting.

In the present case I believe the ICC, because of its approach to the use of opportunity costs, skewed the balancing process in such a way that a clear error of judgment was made and a result reached that is inconsistent with national rail policy as articulated by Congress. I would remand to the ICC for further development of the record concerning the burdens on interstate commerce caused by continued operation of the Mason City line.

Clearly, the problem of adequacy of railroad revenues is of concern to Congress. It is the policy of the United States government to "allow[ ] rail carriers to earn adequate revenues." 49 U.S.C. § 10101a(3). Congress has also recognized as a goal, however, the "development and continuation of a sound rail transportation system * * * to meet the needs of the public and the national defense." 49 U.S.C. § 10101a(4). By the same token, a rail carrier is permitted to abandon part of its railroad lines "only if the Commission finds that the present or future public convenience and necessity require or permit the abandonment or discontinuance." 49 U.S.C. § 10903(a). Competing goals of revenue adequacy for carriers and provision of needed rail service for the public have thus been recognized. Congress has not indicated, though, that the answer to the problem of railroad revenue inade-

quacy is wholesale abandonment of branch lines that fail to earn a profit equal to the rail industry's cost of capital.

In an industry in which profits historically have been below the cost of capital, too heavy reliance on a cost of capital criterion to determine whether a given line is adequately profitable may well lead to abandonment of many rail lines which, while profitable, do not earn as much as the industry's cost of capital. The present case is a good illustration. In the base year the Mason City line generated profits of $235,-874. After the ICC adjusted this figure for normalized maintenance, profits were found to be $59,196. The line thus returned a 3.0% profit on the net liquidation value of the line. This figure is not far below CNW's overall return on assets of only 3.6% in the base year. The ICC, however, used a figure of 10.2% as the railroad's cost of capital, multiplied this figure times the net liquidation value of the line, and determined that the product, $202,743, was the railroad's opportunity cost of operating the line. Hence, the ICC determined that the railroad suffered an economic loss of $143,-547 from operation of the line. Consequently, when the cost of capital is included, the ICC calculations show an economic loss on a line that during the base year generated for the company revenues substantially higher than expenditures.

In my view, the ICC did not properly conduct the required balancing process in the present case because it put too much emphasis on the line's failure to realize a rate of return comparable to the cost of capital. If in future cases the ICC gives to opportunity cost analysis the weight it was given in this case, there is little doubt that few branch lines will survive abandonment proceedings. From CNW's low overall rate of return it may be inferred that not many branch lines will measure up to a standard reflecting a 10.2% rate of return. My concerns are well-expressed in the appellant's brief:

> Under the ICC's rationale in this case, therefore, continued operation of most, if not all, of C & NW's lines of railroad

involves an opportunity cost which burdens interstate commerce. If the rail line involved in this case can be permitted to be abandoned on that basis, then most or all of C & NW's other lines of railroad can also be permitted to be abandoned on that basis. And the same is true with respect to thousands of miles of railroad lines of other rail carriers the operation of which does not produce a return on value equal to the rail industry cost of capital.

Brief for Appellants at 20 (footnote omitted).

I have no quarrel with the examination of revenue adequacy in abandonment proceedings, nor is the industry's cost of capital an impermissible consideration. In this case, however, where a railroad of modest profitability (3.6%) desires to abandon a branch line of commensurate profitability (3.0%), I believe the ICC used a standard for measuring profitability which bears no reasonable relationship to the profitability of the railroad under consideration. Application of this standard decisively to determine that operation of the branch line would be a burden to CNW constitutes a clear error of judgment that is contrary to expressed national rail policy. Courts should not "rubber-stamp * * * administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." *NLRB v. Brown*, 380 U.S. 278, 291, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 (1965), *quoted in Bureau of Alcohol, Tobacco and Firearms v. Federal Labor Relations Authority,* —— U.S. ——, ——, 104 S.Ct. 439, 442, 78 L.Ed.2d 195 (1983).

Accordingly, I would reverse and remand to the ICC so that it can reconsider its determination of the burden that continued operation of the Mason City line would impose on interstate commerce. Once a proper assessment of the cost to CNW of continued operation of the line is made, a balancing process between railroad and public interests may be undertaken in a way consistent with congressional expressions of national rail policy.