**CARTERSVILLE ELEVATOR, INC., Community Elevators, Inc., Farms Co-op Society, Farmers Community Co-op Elevator, Farmers Community Co-op, Inc. and Four County Agricultural Supply, Inc., Petitioners,**

v.

**INTERSTATE COMMERCE COMMISSION, Respondent,**

and

**Chicago and North Western Transportation Company, Intervening Respondent.**

No. 82–2276.

United States Court of Appeals, Eighth Circuit.

Submitted March 15, 1984.

Decided June 1, 1984.

John Broadley, Gen. Counsel, Henri F. Rush, Associate Gen. Counsel, Louis Mackall, Atty., I.C.C., Washington, D.C., for respondent.

Michael P. Casey, St. Louis, Mo., Thomas F. McFarland, Jr., Chicago, Ill., for petitioners; Lewis, Rice, Tucker, Allen & Chubb, St. Louis, Mo., Belnap, Spencer & McFarland, Chicago, Ill., of counsel.

Robert T. Opal, Chicago, Ill., for intervening respondent Chicago and North Western Transp. Co.

Before LAY, Chief Judge, and HEANEY, BRIGHT, ROSS, McMILLIAN, ARNOLD, JOHN R. GIBSON, FAGG and BOWMAN, Circuit Judges, en banc.

JOHN R. GIBSON, Circuit Judge.

The issue before us is whether, in a rail abandonment proceeding, the consideration of opportunity costs must be accompanied by evidence and findings that the carrier will reinvest the assets freed by the abandonment in alternative rail uses. Petitioners argue that the failure to impose such a reinvestment condition contravened the ICC's statutory mandate and was arbitrary and capricious. A panel of this court decided, with Judge Fagg dissenting, that the

ICC's actions were lawful. *Cartersville Elevator, Inc. v. I.C.C.*, 724 F.2d 668 (8th Cir.1984). We granted rehearing en banc. We affirm.

The Chicago and North Western Transportation Company (CNW) petitioned the ICC for authorization to abandon 35.6 miles of rail line between Mason City and Kesley, Iowa (Mason City line). The ICC is authorized to approve abandonments if required or permitted by "the present or future public convenience and necessity." 49 U.S.C. § 10903(a) (Supp. V 1981). This standard requires that the ICC balance the local benefit of the line's continued operation against the present and future burden its operation imposes on interstate commerce. *Colorado v. United States*, 271 U.S. 153, 46 S.Ct. 452, 70 L.Ed. 878 (1925). The ICC recently revised its methodology for determining the profitability of a particular line—the accepted measure of its burden on interstate commerce—to include opportunity costs. *Abandonment of Railroad Lines—Use of Opportunity Costs*, 360 I.C.C. 571 (1979), *aff'd, Farmland Industries, Inc. v. United States*, 642 F.2d 208 (7th Cir.1981) (*Opportunity Costs*). Opportunity costs reflect the economic loss incurred by the carrier in foregoing an alternative use of the line's assets. They are calculated by multiplying the net liquidation value of the line by a rate of return deemed adequate by the ICC.

In approving CNW's petition, the ICC determined that the Mason City line was marginally profitable, earning $59,196.00 in the base year. However, by multiplying the line's net liquidation value ($1,987,-679.00) by the appropriate rate of return (10.2%), the ICC found that CNW incurred $202,743.00 in opportunity costs in operating the line during the same year. The net result was that CNW suffered a $143,-547.00 "economic loss" from the line, thus leading the ICC to conclude that it was imposing a burden on interstate commerce. Against this burden was balanced the detrimental impact abandonment would have on the protesting shippers. The ICC found that the shippers failed to produce evidence of increased costs or inconvenience resulting from abandonment, and in fact had not even claimed that the loss of service would seriously harm their operations. *Chicago and North Western Abandonment*, 366 I.C.C. 373, 380 (1982). It further found that sufficient transportation alternatives existed in the areas served by the Mason City line. This lack of harm to the shippers, balanced against the line's burden on interstate commerce, resulted in the ICC approving CNW's abandonment petition.

CNW first argued before the panel that this court lacked jurisdiction to hear the appeal because the shippers' October 22, 1982, petition for judicial review was not filed within 60 days of the May 21 final order granting the abandonment. *See* 28 U.S.C. § 2344 (1982). We noted, however, that the shippers filed an administrative appeal on June 21 that was ultimately denied by the ICC on August 26. The shippers assumed this to be a discretionary appeal and filed it within the time limits imposed on such appeals. *See* 49 C.F.R. § 1115.4 (1982). Appeals of this nature have been permitted to toll the 60-day period. *See B.J. McAdams v. I.C.C.*, 551 F.2d 1112 (8th Cir.1977). The ICC subsequently reclassified the appeal as a petition to reopen, a category of appeals for which tolling would be less appropriate because they may be filed anytime, even years, after a final order. *See Provisioners Frozen Express, Inc. v. I.C.C.*, 536 F.2d 1303 (9th Cir.1976). Despite this reclassification, we concluded that the shippers' prompt and timely filing insured that the interests of finality would not be compromised by permitting their appeal to toll the 60-day period. For this reason, as we more fully developed in the panel opinion, the petition for judicial review, filed 57 days after the ICC's denial of the shippers' appeal, was timely.

Proceeding to the merits, the shippers first reassert their claim that the ICC's decision was contrary to its judicially-interpreted statutory mandate. They argue that lines deemed unprofitable on the basis of substantial opportunity costs do

not burden interstate commerce unless the freed assets are subsequently reinvested in other rail uses, thereby improving overall rail service. Our review of the ICC's decision not to adopt the reinvestment condition is limited; it must be upheld if it has a "reasonable basis in law," *NLRB v. Hearst Publications*, 322 U.S. 111, 131, 64 S.Ct. 851, 861, 88 L.Ed. 1170 (1944), and does not conflict with the abandonment statute's mandate or underlying purpose, *Volkswagenwerk v. FMC*, 390 U.S. 261, 272, 88 S.Ct. 929, 935, 19 L.Ed.2d 1090 (1968).

The ICC considered and rejected during its rulemaking process the same reinvestment requirement at issue here. *Opportunity Costs*, 360 I.C.C. at 577. In addition, the post-abandonment nonrail use of assets has been approved both explicitly, *Simmons v. United States*, 698 F.2d 888 (7th Cir.1983), and implicitly, *Farmland Industries, Inc. v. United States*, 642 F.2d 208 (7th Cir.1981); *Missouri Pacific R.R. v. United States*, 625 F.2d 178 (8th Cir.1980); *In re Boston and Maine Corp.*, 596 F.2d 2 (1st Cir.1979), in past judicial decisions. The ICC's purpose in adopting opportunity cost analysis is to allow railroads "to achieve an overall rate of return sufficient to attract investment capital." *Opportunity Costs*, 360 I.C.C. at 577. The ICC found that the failure of a particular line to earn this adequate rate of return burdens interstate commerce by creating a "hidden form of cross-subsidization," whereby higher rates must be earned on some lines to compensate for losses suffered on other lines not earning this return. *Id.* Congress has similarly recognized in the Staggers Rail Act the importance of allowing railroads the opportunity to raise necessary capital. *See* H.R.Rep. No. 1035, 96th Cong., 2d Sess. 53, *reprinted in* 1980(4) U.S.Code Cong. & Ad.News, 3978, 3998.

Judge Fagg's dissent expressed concern with the too-ambitious use of a revenue adequacy rationale to justify the use of opportunity cost analysis in abandonment decisions. He noted that revenue adequacy and the provision of necessary rail service are "competing goals" of national rail policy, 724 F.2d at 676, and that rail carriers

should not therefore be permitted to abandon themselves into profitability. We cannot agree, however, that this observation indicates Congress' desire to foreclose a railroad's option of improving its position by excising the less profitable portions of its operation. The road to recovery often requires such measures and railroads are no exception. Moreover, our review is limited to determining if the ICC's failure to adopt the reinvestment limitation is unreasonable or contrary to the language or purpose of the "public convenience and necessity" mandate. We cannot say that it is.

■ The shippers' second argument is that the ICC's approval of the Mason City line abandonment was arbitrary and capricious. This standard requires us to "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971). In permitting the abandonment, the ICC examined numerous factors in addition to opportunity costs in determining if the line was burdening interstate commerce. Balanced against this burden was the impact abandonment would have on the local shippers. As mandated by *Colorado v. United States, supra*, the abandonment was approved because the minimal impact on the shippers did not outweigh the burden on interstate commerce.

The balancing procedure makes evident that far different considerations would be presented should there be a showing of substantial burden on shipper or community interests. We further observe that there was no showing in this case that the freed assets would be utilized to do other than improve the economic health of this particular carrier. Again, far different considerations would exist for the ICC if the abandonment of the line would serve not only to improve the economic health of the railroad itself, but also of other totally nonrail business. At the oral argument we

were told, without contradiction from counsel for petitioners, that CNW does not engage in any nonrail business. We therefore need not and do not discuss in this case the propriety of a reinvestment requirement as applied to a railroad that does have other lines of business. In this case, all relevant factors were considered in a rational manner, and we cannot therefore say that the ICC's actions were arbitrary or capricious.[1]

Our reasoning has been set forth in greater detail in the panel opinion, which we adopt with the reservations here expressed. We affirm.

FAGG, Circuit Judge, dissenting, joined by HEANEY, Circuit Judge.

I dissent for the reasons given in my dissent from the panel opinion. *Cartersville Elevator, Inc. v. Interstate Commerce Commission*, 724 F.2d 668, 676 (8th Cir.1984) (Fagg, J., dissenting).

As I have previously observed, in the vast majority of abandonment cases use of opportunity cost analysis will pitch a branch line that is otherwise profitable into the red. Thus for a branch line that is indeed earning a profit based on its income and expenses, use of a rate of return figure representing the rail industry's cost of capital, a figure which is hypothetical at best because it bears no reasonable relationship to the rate of profitability of the railroad under consideration, distorts the burden on the railroad of continued operation of the branch line. Consequently, when, as in this case, the rate of return earned by a branch line closely approximates a railroad's overall rate of return, it is inappropriate to determine opportunity costs based on the rail industry's cost of capital, since in such a case the branch line is by comparison not a significant burden on the railroad. I do not quarrel with the use of opportunity cost analysis, however, if it is shown that the rate of return used to calculate opportunity costs could be

earned on the assets devoted to the branch line were they put to another rail use, either by transfer or by liquidation and reinvestment. A significant disparity between the present return on the branch line's assets and the return which could be achieved by their investment in another rail use would provide a sound basis for finding that the branch line constitutes a burden on the railroad.

In reliance on representations by counsel for CNW that the company does not engage in business apart from operation of the railroad, the court has in this case proceeded on the assumption that the abandonment will improve the economic status of CNW's rail transportation enterprise. Hence the court has essentially reached its own conclusion concerning the use to be made of the assets freed by abandonment, and accordingly it need not and does not take a position on the propriety of using opportunity cost analysis without a requirement of reinvestment in alternative rail uses when the railroad in question is also involved in nonrail enterprises.

In my view, reliance in abandonment proceedings on opportunity cost calculations made without regard to the use of the assets following abandonment bears no reasonable relationship to the goal of strengthening the financial condition of railroads, not as an end in itself, but rather as a means to the ultimate purpose of providing needed rail service. I believe it is imperative that the ICC determine the use to which assets from a branch line will be put before its abandonment is permitted on the basis of opportunity cost analysis. Without this constraint on its application, opportunity cost analysis merely allows the reduction of assets devoted to railroading without any assurance that improvement of rail service will result. Opportunity cost analysis is inappropriate when a nonrail use of assets is contemplated following abandonment, for in such a case neither the abandonment nor the process by which it

---

**1.** The shippers also argued before the panel that the ICC's use of opportunity costs was contrary to its own regulations. We believe that this

concern was adequately addressed in the panel opinion. *See* 724 F.2d at 673.

**1064**

was approved does anything to strengthen the railroad operation. ICC willingness to allow railroads to realize adequate rates of return by reinvestment of branch line assets in other lines of business would be foreign to its duty to preserve viable arteries of branch line service incidental to maintenance of a strong national railroad system.

Even in this instance, where vague remarks of counsel imply the CNW assets freed by abandonment are apparently destined for rail use, I cannot concur in the ICC's disposition of this case or in the court's holding. Because of the potential for serious distortion of the burden imposed by a branch line, consideration of opportunity costs based on the rail industry's cost of capital must be accompanied by a careful application of the balancing process required by *Colorado v. United States*, 271 U.S. 153, 168, 46 S.Ct. 452, 455, 70 L.Ed. 878 (1926). I believe that by comparing the branch line's 3.0% rate of return to the 10.2% figure for the rail industry's cost of capital, despite CNW's overall 3.6% rate of return, the ICC used a method for determining the burden imposed by operation of the branch line which is divorced from the actual circumstances of this railroad. I am unconvinced that the ICC did not treat the extreme result of its opportunity costs analysis as dispositive in this case. Hence I would remand to the ICC for reconsideration, based on appropriate standards, of the burden that continued operation of the line would impose on CNW and on interstate commerce. Only after the burden is properly determined will it be possible to conduct a balancing process between the local benefit of continued operation of the branch line and the burden its operation imposes on interstate commerce.