SOUTHERN PACIFIC TRANSPORTA-
TION CO., Plaintiff and
Counterdefendant,

v.

CALIFORNIA COASTAL COMMISSION,
Defendant and Counterclaimant.

No. C–80–3916–MHP.

United States District Court,
N. D. California.

Aug. 11, 1981.

Thormund A. Miller, Louis P. Warchot, Gary A. Laakso, San Francisco, Cal., for plaintiff and counterdefendant.

Linus Masouredis, Deputy Atty. Gen., San Francisco, Cal., for defendant and counterclaimant.

## OPINION

PATEL, District Judge.

The Southern Pacific Transportation Company (hereinafter Southern Pacific) brought this action for declaratory relief against the California Coastal Commission (Coastal Commission), which has filed a counterclaim for declaratory and injunctive relief. As there are no disputed issues of material fact, the parties have filed cross motions for summary judgment.

This controversy concerns a stretch of railroad line (hereinafter the Monterey Line) which extends for a distance of 6.72 miles from milepost 123.30 (near Seaside) to milepost 130.02 in the Monterey Peninsula area. The Monterey Line passes through choice realty including the town of Pacific Grove and Cannery Row in Monterey. Southern Pacific, which owns the Monterey Line and operated train service along it, filed an abandonment application with the Interstate Commerce Commission (I.C.C.) on December 29, 1978. By a decision on February 26, 1979, the I.C.C. approved the

application and issued a permit which provided, *inter alia*, for both the cessation of service and dismantling of the right of way. Removal of the trackage would effectively foreclose the future use of the Monterey Line for rail transportation. The I.C.C.'s decision was published in the Federal Register on March 27, 1979 and became effective on May 11, 1979. 44 Fed.Reg. 18,316 (1979).

The Coastal Commission did not receive actual notice of Southern Pacific's abandonment application prior to the I.C.C.'s final determination. On June 21, 1979 the Coastal Commission's Legal Counsel wrote to the Chairman of the I.C.C. informing him that the Coastal Commission wanted to exercise its authority under § 307(c)(3) of the Coastal Zone Management Act of 1972 (CZMA) (current version at 16 U.S.C. § 1456(c)(3)(A) (1976)), to review the proposed dismantling of the right of way for consistency with the California Coastal Zone Management Program. In response to this claim, Southern Pacific filed the instant action for declaratory relief in order to avoid liability for violating the CZMA if it complies with the I.C.C. order.

The cross motions for summary judgment raise four legal issues: (1) is tearing up the tracks and dismantling the right of way (as distinguished from ceasing rail service) within the jurisdiction of the Coastal Commission pursuant to the CZMA; (2) if the Coastal Commission does have jurisdiction pursuant to the CZMA, has this authority been preempted or repealed by the abandonment provisions of the Interstate Commerce Act; (3) has the Coastal Commission waived its rights by failing to exercise them in a timely manner, and (4) does this court have jurisdiction over the Coastal Commission's counterclaim seeking injunctive relief?

## I

THE COASTAL COMMISSION HAS AUTHORITY TO REVIEW RAILROAD ABANDONMENT PERMITS THAT PROVIDE FOR STRUCTURAL CHANGE IN THE RIGHT OF WAY

The Coastal Commission, as an authorized state agency for purposes of the CZMA, has expansive jurisdiction to review federal licenses or permits for consistency with its coastal zone management plan. At the outset the court notes that the Coastal Commission is not asserting jurisdiction over I.C.C. permits allowing a railroad to cease rail service, but only over permits to the extent that they provide for physical alteration in the right of way. Southern Pacific's challenge to the Coastal Commission's jurisdiction under the CZMA raises two issues: (1) whether Congress intended CZMA review procedures to extend to I.C.C. permits or licenses; and (2) whether track removal is a future land use under CZMA consistency provisions.

█ In enacting the CZMA Congress explicitly recognized the need to motivate and assist the coastal states in developing resource management programs in order to preserve and develop the nation's coastal resources. 16 U.S.C. §§ 1451–1452. Under the CZMA, once the Secretary of Commerce has determined that a state's proposed plan comports with the CZMA, the Secretary is authorized to make grants to the state absorbing up to 80% of the administrative costs of the program. 16 U.S.C. § 1455a. Of primary significance here is that approval also brings into play the federal consistency provision, which provides in relevant part:

> After final approval by the Secretary of a state's management program, *any applicant for a required Federal license or permit to conduct an activity affecting land or water uses in the coastal zone of that state shall provide in the application to the licensing or permitting agency a certification that the proposed activity complies with the state's approved program and that such activity will be conducted in a manner consistent with the program.* At the same time, the applicant shall furnish to the state or its designated agency a copy of the certification, with all necessary information and data. Each coastal state shall establish procedures for public notice in the case of all

such certifications and, to the extent it deems appropriate, procedures for public hearings in connection therewith. At the earliest practicable time, the state or its designated agency shall notify the Federal agency concerned that the state concurs with or objects to the applicant's certification. If the state or its designated agency fails to furnish the required notification within six months after receipt of its copy of the applicant's certification, the state's concurrence with the certification shall be conclusively presumed. *No license or permit shall be granted by the Federal agency until the state or its designated agency has concurred with the applicant's certification or until, by the state's failure to act, the concurrence is conclusively presumed, unless the Secretary, on his own initiative or upon appeal by the applicant, finds after providing a reasonable opportunity for detailed comments from the Federal agency involved and from the state, that the activity is consistent with the objectives of this chapter or is otherwise necessary in the interest of national security.* 16 U.S.C. § 1456(c)(3)(A) (emphasis added). This section indicates that it was Congress' intention to make compliance with the consistency review procedure mandatory as to any applicant for a required federal license or permit.

An examination of the legislative history of the CZMA supports this interpretation. Congress intended the consistency provision to play a crucial role in motivating the states to cooperate with the federal government under the CZMA. This enhancement of the power of the coastal states was to be limited only by "matters of overriding national interest." S.Rep.No. 277, 94th Cong., 2d Sess. 9, *reprinted in* [1976] U.S.Code Cong. & Ad.News 1768, 1776. Congress provided no automatic exemption for CZMA-mandated consistency review even in the sensitive area of defense projects. S.Rep.No. 753, 92nd Cong., 2d Sess., *reprinted in* [1972] U.S.Code Cong. & Ad.News 4776, 4793.

■ There is nothing intrinsic in the nature of I.C.C. abandonment proceedings which could reasonably be characterized as of overriding national interest. Given Congressional intention to craft a broad statute, it is not the function of this court to narrow it. *Consumers Union v. Heimann,* 589 F.2d 531, 533 (D.C.Cir.1978). Furthermore, the Office of Coastal Zone Management in the National Oceanic and Atmospheric Administration (N.O.A.A.), which administers the CZMA, has determined that the Coastal Commission does have authority over abandonments. N.O.A.A. should be afforded considerable deference by the courts with respect to its interpretation of its own regulations. *American Petroleum Institute v. Knecht,* 609 F.2d 1306, 1310 (9th Cir. 1979). For the foregoing reasons this court holds that Congress did not intend to leave I.C.C. abandonment proceedings outside the scope of the CZMA.

■ Southern Pacific argues that removing the tracks is merely a precursor to future land use and is therefore not within the scope of Coastal Commission authority under § 1456(c)(3)(A). This argument lacks merit. California was one of the earliest states to have its proposed coastal zone management program approved as being in compliance with the CZMA. *American Petroleum Institute,* 609 F.2d at 1309. One aspect of the program is the California Coastal Act of 1976, Cal.Pub.Res.Code §§ 30000–31405. Pursuant to this enactment the Coastal Commission has primary authority over enforcement of the consistency provisions of the CZMA. *Id.* § 30330. Under California's federally-approved statutory scheme, "development" is defined as encompassing the alteration or demolition of any structure, including the facilities of any public, municipal, or private utility. *Id.* § 30106. "Structure" is defined broadly, and includes such things as roads and electric power lines. *Ibid.* Under this definition, demolition of the right of way is included within the scope of development along it.

There is nothing in the CZMA or its legislative history to suggest that Congress in-

tended to narrow the authority of the states by virtue of the artificial dichotomy urged by Southern Pacific. Congress sought to enhance the state's control over land use in the coastal zone by development of comprehensive management plans. S.Rep.No. 753, 92d Cong., 2d Sess., *reprinted in* [1972] U.S. Code Cong. & Ad. News 4776, 4779–80. As it is undisputed that once the tracks are gone several future land use options will be eliminated, an interpretation of § 1456(c)(3)(A) along the lines suggested by Southern Pacific would severely disable the Coastal Commission in the performance of its Congressionally mandated task of managing land use in the coastal zone. Thus, the Coastal Commission does have authority under the CZMA to conduct a consistency review of the abandonment permit with respect to track removal and dismantling the right of way.

## II

## THE JURISDICTION OF THE COASTAL COMMISSION OVER ABANDONMENTS PURSUANT TO THE CZMA IS NOT PREEMPTED OR REPEALED BY THE REVISED INTERSTATE COMMERCE ACT

■ Although §§ 10903–10907 of the Revised Interstate Commerce Act (current version at 49 U.S.C.A. §§ 10903–10907)[1] vest primary authority over abandonments as a whole in the I.C.C., they are not a talisman before which all other regulation of abandonments pursuant to other congressional enactments must fall (to paraphrase *Coolidge v. New Hampshire*, 403 U.S. 443, 461–62, 91 S.Ct. 2022, 2035, 29 L.Ed.2d 564 (1971)). It bears repeating that the dispute in this case is only over

whether the Coastal Commission can regulate the physical removal of the trackage. Thus, the question is whether Congress intended to strip approved state agencies acting under color of the CZMA of any power to review I.C.C. abandonment permits. For the reasons indicated below, this court declines to interpret the abandonment provisions of the Revised Interstate Commerce Act as curtailing the authority of the Coastal Commission under the CZMA.

Whether the Coastal Commission's jurisdiction under the CZMA has been curtailed by the abandonment provision is not in reality a preemption issue because the CZMA contemplates a joint federal-state regulatory program. *Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 178 n.28, 98 S.Ct. 988, 1004 n.28, 55 L.Ed.2d 179 (1978). In *Askew v. American Waterways Operators, Inc.*, 411 U.S. 325, 93 S.Ct. 1590, 36 L.Ed.2d 280 (1973), the Supreme Court refused to find that the federal Water Quality Improvement Act of 1970 preempted state authority over oil spills because it was "clear at the outset that the Federal Act does not preclude, but in fact allows, state regulation." *Id.* at 329, 93 S.Ct. at 1594. Similarly, in view of the clear intent of Congress in enacting the CZMA to develop a joint federal-state system for management of coastal zone resources, the question before this court is whether the abandonment provision, a federal statute, preempts or repeals in part the CZMA, another federal law.

Congress has not explicitly repealed any part of the CZMA by passage of the revised Interstate Commerce Act. In fact, former 49 U.S.C. § 1a(1) (1976) provided, *inter alia*, that "[a]bandonments and discontinuances shall be governed by the provisions of this

---

1. The abandonment provisions of the Interstate Commerce Act were originally enacted as part of the Transportation Act of 1920, Pub.L.No. 66–152, § 402, 41 Stat. 456, 477–78 (1920), and were codified as former 49 U.S.C. § 1(18)–(22) (repealed 1976). These provisions were repealed by the Railroad Revitalization and Regulatory Reform Act of 1976, Pub.L.No. 94–210, §§ 802, 809, 90 Stat. 31, 127–30, 144–46 (1976), and a new abandonment section was codified as former 49 U.S.C. § 1a (1976) (repealed 1978). This section itself was repealed by the enact-

ment of the Revised Interstate Commerce Act, Pub.L.No. 95–473, 92 Stat. 1337 (1978), and recodified without substantial change as 49 U.S.C. §§ 10903–10907 (1979 Supp. III). Further modifications in the abandonment provisions (not yet reflected in the United States Code) were effected by § 402 of the Staggers Rail Act of 1980, Pub.L.No. 96–448, § 402, 94 Stat. 1895, 1941–45 (1980). In this decision the court cites to the most recent version, as if officially codified, unless otherwise indicated.

section or by the provisions of any other applicable Federal statute."[2] In *Morton v. Mancari,* 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974), the Supreme Court explained the narrow role of a court where there is no manifest Congressional intention to repeal an earlier enactment.

> In the absence of some affirmative showing of an intention to repeal, the only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable....
>
> ....
>
> The courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.

*Id.* at 550–51, 94 S.Ct. at 2482–83.

As repeal by implication is not favored, it is incumbent upon this court to give full effect to both enactments if at all possible. *Kenai Peninsula Borough v. Alaska,* 612 F.2d 1210, 1214 (9th Cir. 1980), *aff'd sub nom. Watt v. Alaska,* —— U.S. ——, 101 S.Ct. 1673, 68 L.Ed.2d 80 (1981). Furthermore, in order for the later statute to repeal the CZMA by implication it would have to cover the entire field occupied by the earlier one. *United States v. Brien,* 617 F.2d 299, 310 (1st Cir. 1980).

In this case, the statutes are not irreconcilable. In *Chicago & Northwestern Transportation Co. v. Kalo Brick & Tile Co.,* 450 U.S. 311, 317, 101 S.Ct. 1124, 1130, 67 L.Ed.2d 258 (1981), the Supreme Court considered (in the context of a preemption challenge) whether laws which placed an unconditional duty on railroads to provide car service conflicted with the abandonment provisions. The Court indicated that the crucial question is whether the challenged statute is an obstacle to the accomplishment of congressional objectives and purposes. Thus, the question whether the CZMA is able to co-exist with the abandonment provisions turns on whether, in light of Congress' objectives in passing the abandonment provisions, the CZMA stands as an obstacle to the accomplishment of those objectives.

The core of Southern Pacific's argument is that the time limits imposed on the processing of abandonments by the I.C.C. pursuant to the abandonment provisions conflicts with the more relaxed timetable for CZMA review. The legislative history of the Staggers Rail Act of 1980, which amended 49 U.S.C. § 10904, is indicative of congressional intent to expedite abandonment proceedings. H.R.Conf.Rep.No.1430, 96th Cong., 2d Sess. 125, *reprinted in* [1980] U.S.Code Cong. & Ad.News 3978, 4110, 4157. However, the inquiry does not end at this point. Pursuant to § 10904 an abandonment may have two phases: (1) discontinuance of rail service, and (2) removal of the trackage. As indicated by the discussion above, the focus of the inquiry must be whether the potential delay in the processing of the abandonment application with respect only to removal of the trackage stands as an obstacle to Congress' purpose in expediting the abandonment process.

Congress' purpose in enacting the original abandonment provisions of the Transportation Act of 1920 was "not primarily to protect the railroad, but to protect interstate commerce from undue burdens or discrimination." *Colorado v. United States,* 271 U.S. 153, 162, 46 S.Ct. 452, 453, 70 L.Ed. 878 (1926). The nature of the threat to interstate commerce which the abandonment provisions were designed to meet was characterized by the Court as follows:

> Prejudice to interstate commerce may be effected in many ways. One way is by excessive expenditures from the common fund in the local interest, thereby lessening the ability of the carrier properly to serve interstate commerce. Expenditures in the local interest may be so large as to compel the carrier to raise reasonable interstate rates, or to abstain from making an appropriate reduction of such rates, or to curtail interstate service, or to forego

---

**2.** This provision was omitted without explanation when the section was recodified under the Revised Interstate Commerce Act as 49 U.S.C. § 10904 (1979 Supp. III).

facilities needed in interstate commerce. Likewise, excessive local expenditures may so weaken the financial condition of the carrier as to raise the cost of securing capital required for providing transportation facilities used in the service, and thus compel an increase of rates. Such depletion of the common resources in the local interest may conceivably be effected by continued operation of an intrastate branch in intrastate commerce at a large loss.

*Id.* at 163, 46 S.Ct. 454. Thus the burden on interstate commerce is the potential hindrance of the railroad from performing its interstate commerce function due to operation of a line against the burden on interstate commerce in determining whether to approve a proposed abandonment as consistent with the present and future public necessity and convenience. In making this determination the I.C.C. is not required to consider the effect of track removal on either the affected locality or on interstate commerce. As part of the legislative history of the Railroad Revitalization and Regulatory Reform Act of 1976, Congress included a brief history of the abandonment provisions. Among the factors which Congress recognized were proper for consideration by the I.C.C. were: the interests of the shippers and public served by the line; the interests of the public at large who might be served by the strengthening of the rail system as a whole, and the interests of the affected employees. S.Rep.No.499, 94th Cong., 2d Sess. 39–41, *reprinted in* [1976] U.S.Code Cong. & Ad.News 53–56. The conclusion to be drawn is that the merits of whether to remove the trackage or not are at most peripheral to the initial determination whether the continued operation of the line is a burden on interstate commerce.

There is substantial authority for the view that the question of track removal is ancillary to the core decision which the I.C.C. must make and, therefore, that once the application to cease service has been approved the need to protect interstate commerce by expediting abandonment proceedings is greatly diminished. In an action brought on state law grounds by shippers against a railroad that discontinued service under an I.C.C. abandonment permit, the Supreme Court held that "the authority of the Commission to regulate abandonments is exclusive." *Chicago & North Western Transportation Co. v. Kalo Brick & Tile Co.,* 450 U.S. 311, 320, 101 S.Ct. 1124, 1131, 67 L.Ed.2d 258 (1981). However, the Court defined an abandonment as " 'characterized by an intention of the carrier to cease permanently or indefinitely all *transportation service* on the relevant line.' " *Id.* at 314, 101 S.Ct. at 1128 n.2 (emphasis added; citations omitted). Thus, the Court recognized that the major thrust of the abandonment provisions is to relieve the railroad of the cost of *operating* an unprofitable line in order to alleviate a burden on interstate commerce. To permit other authorities to delay or in any way impede this process would be contrary to the objectives of Congress in passing the abandonment provisions. Once the major burden is lifted, however, there is no longer a need for exclusive jurisdiction in the I.C.C.

Southern Pacific argues that CZMA review imposes a significant burden on interstate commerce in the form of the opportunity cost of delay in recycling the trackage. In the recent case of *In re Boston & Maine Corp.,* 596 F.2d 2 (1st Cir. 1979), the court held that states do not have authority over the track removal phase of abandonments. This case is readily distinguishable as it involved preemption of state law rather than the alleged implied repeal of a joint federal-state program. In addition, it can be distinguished because of the federal courts' exclusive bankruptcy jurisdiction.

The most significant difference between the present case and *In re Boston & Maine* is that in that case the district court had approved a petition for reorganization under § 77(a) of the Bankruptcy Act, 11 U.S.C. § 205(a), and had subsequently authorized the trustees to apply to the I.C.C. for an abandonment certificate. 596 F.2d at 4. The court observed that the financial condition of the railroads is a federal concern because it impacts on their ability to provide services which in turn affects inter-

state commerce. *Id.* at 6; *see Colorado v. United States*, 271 U.S. 153, 162, 46 S.Ct. 452, 453, 70 L.Ed. 878 (1926). The court also held that salvaging the rails provides a significant economic benefit to the railroad. *In re Boston & Maine Corp.*, 596 F.2d at 6. In view of the financial plight of the railroad in that case, the opportunity cost of leaving the rails in the ground apparently would have been a burden on interstate commerce. Whether this court would curtail the Coastal Commission's authority if this were a bankruptcy and reorganization proceeding need not be decided at this time. In the factual circumstances of this case, plaintiff has not demonstrated that the potential loss of some income due to a short delay as a result of CZMA mandated consistency review is a significant burden on the railroad's performance of its interstate commerce function.

Congress clearly sought to make the CZMA applicable to all federal permits and licenses. In view of the objectives of the abandonment provision of the Interstate Commerce Act, this court holds that there is no conflict between the two enactments with respect to CZMA consistency review by the Coastal Commission of the proposed dismantling of the right of way, and therefore that such review is within defendant's authority.

### III

THE COASTAL COMMISSION HAS NOT WAIVED ITS RIGHT TO REVIEW THE ABANDONMENT PERMIT, BECAUSE IT DID NOT RECEIVE ACTUAL NOTICE OF THE PENDING I.C.C. ABANDONMENT PROCEEDING

The parties agree that the Coastal Commission did not have actual notice of the I.C.C. abandonment proceeding, despite Southern Pacific's compliance with all rele-

vant notice requirements under the abandonment provisions. The abandonment provisions simply do not provide for notice to CZMA state agencies. Nevertheless, Southern Pacific argues that the Coastal Commission waived its rights under the applicable regulations by failing to inform the I.C.C. of its intent to review the abandonment permit in a timely manner. The regulation, 15 C.F.R. § 930.54(a) (1980), that governs review of permits of licenses for unlisted activities,[3] provides in pertinent part that "[s]tate agencies must inform the Federal agency and applicant within 30 days from notice of the license or permit application, otherwise the State agency waives its right to review the unlisted activity." The question presented by the facts of this case is whether constructive notice is sufficient under this section.

Southern Pacific cites 44 U.S.C. § 1508 (1976) (a portion of the Federal Register Act) as authority for the proposition that notice by publication in the Federal Register is legally sufficient notice. However, 15 C.F.R. § 930.54(a) does not compel state agencies to review the Federal Register, and provides that "[t]he waiver does not apply in cases where the State agency does not receive notice of the Federal license or permit activity." If constructive notice by publication in the Federal Register were deemed sufficient, this passage would be devoid of any meaning. The provision for an exception in case of lack of notice would be superfluous. Moreover, 44 U.S.C. § 1508 provides for an exception in "cases where notice by publication is insufficient in law." This exception defeats Southern Pacific's argument. Finally, if actual notice is not required, the 30-day time limit for action under 15 C.F.R. § 930.54(a) (1980) would be very difficult to administer. Thus, actual notice must be required in order to trigger the thirty day period set forth in § 930.54(a).[4] As the

---

**3.** Pursuant to 15 C.F.R. § 930.53 (1980), state agencies, with the assistance of federal licensing agencies, are to develop a list of federal license and permit activities that will probably affect the coastal zone. Railroad abandon-

ments were not a listed permit or license activity.

**4.** Because actual notice is required, this court need not and does not resolve the question whether Southern Pacific's actions constituted constructive notice.

Coastal Commission did not receive actual notice, it cannot be deemed to have waived its right to review Southern Pacific's abandonment permit.

## IV

## THIS COURT DOES NOT HAVE JURISDICTION TO GRANT THE RELIEF SOUGHT BY THE COASTAL COMMISSION

 Prior to 1975, the power to review I.C.C. orders was vested in three-judge district courts. Pursuant to 28 U.S.C. § 2321(a) (1976), the jurisdiction to review I.C.C. orders, with the exception of orders directing the payment of money or collection of fines, penalties or forfeitures, is now in the courts of appeals. *Island Creek Coal Sales Co. v. ICC*, 561 F.2d 1219, 1221–22 (6th Cir. 1977). 28 U.S.C. § 2321(a) provides in relevant part that "a proceeding to enjoin or suspend, in whole or in part, a rule, regulation, or order of the Interstate Commerce Commission shall be brought in the court of appeals." Only the court of appeals on direct review may enjoin an order of the I.C.C. No timely petition for review was filed in this case.

The Coastal Commission suggests that this court can circumvent this limitation on its power by ordering Southern Pacific to cure the defect in the I.C.C. permit by applying for a coastal permit. Although this is an attractive argument, this court simply lacks the power to issue an order which would in effect suspend or enjoin an I.C.C. order. In *Seaboard Air Line Railroad Co. v. Daniel*, 333 U.S. 118, 122–23, 68 S.Ct. 426, 428–29, 92 L.Ed. 580 (1948), the Supreme Court distinguished the power of a court to question the validity and scope of an I.C.C. order from issuing a decree to set it aside or suspend it. *See also Illinois Central R.R. v. State Public Util. Comm'n.*, 245 U.S. 493, 504–05, 38 S.Ct. 170, 174, 62 L.Ed. 425 (1918). Under appropriate circumstances a district court may rule on the validity of the order, but it may not act to block its enforcement.

Thus, the court can (and does) deny Southern Pacific the relief it seeks and rule that the track removal phase of the abandonment was subject to consistency review by the Coastal Commission. However, to grant the Coastal Commission the relief it seeks would be equivalent to enjoining or suspending the I.C.C. order.

The Coastal Commission's counterclaim must be dismissed for lack of jurisdiction. Southern Pacific's motion for summary judgment is denied. Judgment will be entered denying the declaratory relief sought by Southern Pacific, and dismissing the counterclaim.

IT IS SO ORDERED.