[No. A032318. First Dist., Div. Five. Dec. 11, 1986.]

ACME FILL CORPORATION, Plaintiff and Respondent, v. SAN FRANCISCO BAY CONSERVATION AND DEVELOPMENT COMMISSION et al., Defendants and Appellants.

1058

**COUNSEL**

John K. Van de Kamp, Attorney General, Andrea Sheridan Ordin, Chief Assistant Attorney General, N. Gregory Taylor, Assistant Attorney General, and Linus Masouredis, Deputy Attorney General, for Defendants and Appellants.

Stephen L. Kostka, Ronald Scales, Phillip S. Althoff and McCutchen, Doyle, Brown & Enersen for Plaintiff and Respondent.

**OPINION**

**HANING, J.**—Acme Fill Corporation (Acme) sought a writ of mandamus under Code of Civil Procedure section 1094.5, challenging San Francisco Bay Conservation and Development Commission's (BCDC) exercise of consistency review authority under the Coastal Zone Management Act, 16

United States Code section 1451 et seq. (CZMA). After Acme applied for a federal permit to expand its Contra Costa County waste disposal site, BCDC registered a consistency objection under the CZMA claiming the proposed expansion was inconsistent with California's federally approved management program for the conservation of San Francisco Bay. Acme argued that BCDC had no authority to render the objection. The trial court rendered judgment for Acme and issued a peremptory writ directing BCDC to vacate and set aside its consistency objection to Acme's proposed expansion. We conclude the trial court erred in determining Acme was not required to exhaust its administrative remedies before resorting to judicial action. We also conclude that BCDC is authorized to render such a consistency objection.

Acme owns and operates a 125-acre landfill used to dispose of central Contra Costa County's residential, commercial, and industrial solid waste. The facility serves 425,000 people in the county and receives approximately 64 percent of the county's solid waste (approximately 45,000 tons of material per month). The landfill site is approximately one mile inland from the shoreline of San Francisco Bay and two miles east of Martinez, California.

In March 1981, Acme filed an application with the United States Army Corps of Engineers (Corps) for a permit to expand its site to a 200-acre parcel adjacent to its existing disposal site.[1] This permit application was later amended to request a permit to fill 97 acres of the site with compacted solid waste. It was anticipated that the expanded site would operate until 1989 and reach a height of approximately 70 feet.

In 1983 BCDC notified the Corps that BCDC believed the proposed issuance of a Corps permit for the Acme landfill expansion required Acme to provide a consistency certification and BCDC review and concurrence under the CZMA. Enacted in 1972, the CZMA seeks to preserve, protect and develop the nation's coastal zones by providing financial assistance to states that develop and implement coastal management programs consistent with its provisions. (16 U.S.C. §§ 1452(1), 1454, 1453(12).) The management program, as defined by the legislation, is to set forth "objectives, policies, and standards to guide public and private uses of lands and waters in the coastal zone." (16 U.S.C. § 1453(12).) After the Secretary of Commerce approves a state management program, federal monetary grants may

---

[1] The Corps' jurisdiction over the landfill expansion site stems from section 10 of the Rivers and Harbors Act of 1899, 33 United States Code section 403, and section 404 of the Clean Water Act, 33 United States Code section 1344.

provide up to 80 percent of the cost of administering the program. (16 U.S.C. §§ 1454-1455.)

In 1977 the San Francisco Bay segment of the California Coastal Management Program was approved (hereafter state's management program). BCDC was identified as the state agency responsible for implementing the state's management program "for the segment of the California coastal zone comprising San Francisco Bay and its adjacent shorelands." (See Pub. Resources Code, § 30330.) After a state's management program meets with federal approval, the CZMA mandates that any federal activity which affects the coastal zone must "to the maximum extent practicable" be consistent with the state's management program. (16 U.S.C. § 1456(c)(1).) To this end, the CZMA provides that applicants requesting a federal permit or license for an activity affecting the coastal zone include in the application "a certification that the proposed activity complies with the state's approved [coastal management] program and that such activity will be conducted in a manner consistent with the program." (16 U.S.C. § 1456(c)(3)(A).)

After the state's designated agency (in this case BCDC) reviews the consistency certification, it either concurs with or objects to the applicant's certification that its proposed activities will be conducted consistently with the provisions and objectives of the state's management program. Under the CZMA "[n]o license or permit shall be granted by the Federal agency until the state or its designated agency has concurred with the applicant's certification . . . ." (16 U.S.C. § 1456(c)(3)(A).) However, it is evident Congress did not intend to give the states an absolute veto power over federal permits in the coastal zone. The Secretary of Commerce is authorized to override a state's consistency objection by finding that the proposed activity is "consistent with the objectives" of the CZMA or is "otherwise necessary in the interest of national security." (*Ibid.*)

Acme initially resisted filing a consistency certification on the ground that its proposed expansion was not subject to consistency review by BCDC. However, Acme eventually assented and filed the requested consistency certification claiming that the proposed expansion of the existing disposal site was consistent with the federally approved management program for San Francisco Bay. It should be noted that Acme has in no way acquiesced to BCDC's claimed authority, but has continued to voice its jurisdictional objection throughout these proceedings.

BCDC held public hearings on Acme's proposed expansion, after which it determined that Acme's proposal was inconsistent with the federally approved management program for San Francisco Bay. BCDC made this

determination based on several findings. First, BCDC determined that Acme's proposed landfill expansion affects land and water uses in San Francisco Bay, a portion of the California coastal zone as defined in the CZMA. To support this finding BCDC pointed out that the expansion site had been designated in the San Francisco Bay Plan (hereafter Bay Plan), which is part of the state's management program, as a water-related industrial use area.[2] The designated use areas were included in the Bay Plan because BCDC and the Legislature recognized the need to reserve land suitable for water-related industrial uses that are so vital to the economy of the entire region. BCDC concluded that if land suitable for water-related industry was used for other purposes, the pressure for more bay fill to make up for the lost area would be increased. From its studies of San Francisco Bay BCDC has found that bay filling has one or more of the following harmful effects: (1) the disruption of the delicate ecological balance in the bay, which has already been damaged by past fills, endangering the very existence of some species of birds and fish; (2) the increased danger of water pollution because of the reduction of the volume of water in the bay to assimilate the increasing quantities of liquid wastes being poured into it; and (3) the reduction of the air-conditioning effects of the bay and increased danger of air pollution in the Bay Area. *Past diking and filling of tidelands and marshlands has already reduced the size of the bay from about 680 square miles in area to little more than 400.* BCDC and the state's federally approved management plan seek to ensure that further bay fill will be limited to an absolute minimum.

Second, a garbage dump is not functionally dependent on a water location and, in the case of Acme's proposed project, would result in the loss of about 97 acres for water-related industry. Consequently, BCDC determined that the preemption of a significant acreage designated for water-related industrial purposes by an industry that does not need to be near the water would adversely affect the coastal zone by increasing pressure for more bay fill and would not be consistent with the state's management program for San Francisco Bay.[3]

---

[2]BCDC has prepared "a comprehensive and enforceable plan for the conservation of the water of the bay and the development of its shoreline." (Gov. Code, § 66603.) The plan includes a set of maps proposing uses for certain areas near the bay. (E.g., recreation, water-related industry, ports, airports and wildlife areas.) (See Gov. Code, § 66651.) As part of the Bay Plan the maps were "made so that proposed uses of certain areas could be planned on a long-range basis." (*Blumenfeld* v. *San Francisco Bay Conservation etc. Com.* (1974) 43 Cal.App.3d 50, 56 [117 Cal.Rptr. 327].) Map No. 17 clearly designates Acme's parcel for "water-related industry."

[3]BCDC succinctly summarizes its objection to the proposed expansion as follows: "The problem in this case is that Acme's proposed land fill use is not a water-related industrial use. One can dump garbage anywhere; one does not have to use up prime water access sites for that purpose."

In addition, BCDC determined that the proposed project could not be considered an appropriate interim use of a water-related industrial site. This determination was made because of the length of time that the landfill operation would exist (6 years) plus the time it would take the site to settle (20 to 30 years). BCDC concluded it would be impractical to develop the site within a period of time that could be considered interim. Moreover, BCDC found that the condition of the site after closure would make it unlikely to be developed for water-related industry. BCDC noted that if the site was filled to a uniform height of 20 feet (as opposed to the proposed 70 feet), BCDC would be "likely" to find the project to be a permissible interim use of the site and therefore consistent with the management program.

For all of these reasons, BCDC found the proposed project inconsistent with the management program for San Francisco Bay and registered its consistency objection under the CZMA. In other words, BCDC objected to the issuance of a Corps permit for the proposed project expansion. We have been informed by the parties that the Corps determined that it could issue a permit for Acme's proposed expansion *in spite of* BCDC's consistency objection. Accordingly, in July 1984 the Corps issued a permit to Acme, but limited the height of the expanded landfill to 40 feet. This action spawned a federal lawsuit by BCDC seeking an order compelling the Corps to rescind the permit. (*State of California* ex rel. *San Francisco Bay Conservation and Development Commission* v. *Colonel Edward M. Lee, Jr.* et al., N.D. Cal. No. C-85-1343 MHP.) The complaint in the federal action alleges that the Corps violated 16 United States Code section 1456(c)(3)(A), by issuing a federal permit for Acme's landfill expansion notwithstanding BCDC's consistency objection. The federal suit has been stayed pending resolution of this case. However, the issues that have been reserved for litigation in the federal forum include whether BCDC complied with preconditions to a consistency review under the CZMA and whether BCDC had jurisdiction to object to the issuance of a federal permit for projects, such as Acme's, located inland from the coastal zone.

▮ Following BCDC's consistency objection, Acme noticed an administrative appeal to the Secretary of Commerce and asked the Secretary to override BCDC's consistency objection. (16 U.S.C. § 1456(c)(3)(A).) As noted above, the appeal to the Secretary of Commerce is the last step in the CZMA administrative process for reviewing a consistency objection. If the Secretary determines that the proposed activity is "consistent with the objectives" of the CZMA or is "otherwise necessary in the interest of national security," the state's consistency objection is rendered ineffective and the project is allowed to proceed. (16 U.S.C. § 1456(c)(3)(A).)

At Acme's request, the Secretary of Commerce stayed any decision on Acme's administrative appeal pending resolution of this case. While recognizing the issues involved in the administrative appeal were "markedly different" from those presented herein, the secretary granted a stay "to allow Acme to test the validity of BCDC's decision in state court as a matter of state law without the burden of having to pursue an administrative Federal appeal on different grounds at the same time." Acme asserts, and the trial court agreed, that it is not required to exhaust this last level of administrative review before seeking a writ of administrative mandamus because the Secretary will not decide the specific issue pending before the state court. We reach a contrary determination.

"[T]he . . . exhaustion of administrative remedies . . . is a condition to the court's jurisdiction which must be addressed" before seeking judicial relief. (*Hittle* v. *Santa Barbara County Employees Retirement Assn.* (1985) 39 Cal.3d 374, 384 [216 Cal.Rptr. 733, 703 P.2d 73].) This rule has specifically been held applicable to anyone seeking to enforce a right granted under a federal statute. (*Hayward* v. *Henderson* (1979) 88 Cal.App.3d 64, 70 [151 Cal.Rptr. 505].) Administrative proceedings must not only be initiated, but must be pursued to their appropriate conclusion before seeking judicial intervention. (*Alta Loma School Dist.* v. *San Bernardino County Com. on School Dist. Reorganization* (1981) 124 Cal.App.3d 542, 554-556 [177 Cal.Rptr. 506].)

It is apparent from the regulatory scheme that in reviewing an appeal the Secretary of Commerce assumes that the proposed activity is inconsistent with the state's management program. (See 15 C.F.R. §§ 930.120-930.134.) Thus, the secretary does not specifically determine whether the appropriate state agency is authorized to render an objection, or whether the proposed activity is consistent or inconsistent with the state program. Rather, the secretary decides whether to override the decision below on federal policy grounds.

Nevertheless, it is manifest that a favorable decision by the secretary would provide Acme with the *relief* it seeks in this action. A ruling by the secretary in favor of Acme renders BCDC's consistency objection ineffective and permits the landfill expansion—exactly what Acme hopes to accomplish by this litigation. Where "a plaintiff may obtain the functional equivalent of judicial remedies, there is substantial authority which holds that there exist salutary reasons for requiring that the administrative remedy be pursued *even though it may not resolve all issues* or provide the precise relief requested by plaintiff." (*Karlin* v. *Zalta* (1984) 154 Cal.App.3d 953, 980 [201 Cal.Rptr. 379] [and cases cited therein], italics added.) The basic

purpose for the exhaustion doctrine is to lighten the burden of overworked courts in cases where administrative remedies are available and are as likely as the judicial remedy to provide the wanted relief. (*Ibid.*; *Duffy* v. *State Bd. of Equalization* (1984) 152 Cal.App.3d 1156, 1163 [199 Cal.Rptr. 886].) We conclude that Acme has provided no justification for failing to exhaust the administrative remedy provided under the CZMA before resorting to the courts.

Since the failure to exhaust administrative remedies is a basic defect, the matter is now subject to dismissal. However, we proceed to render this opinion because the questions presented are of law, they pose issues of broad public interest, and the merits of this controversy will not be resolved by the administrative proceeding before the Secretary of Commerce and are likely to reoccur. (See *United Farm Workers of America* v. *Superior Court* (1976) 16 Cal.3d 499, 503-504 [128 Cal.Rptr. 209, 546 P.2d 713]; *Green* v. *Layton* (1975) 14 Cal.3d 922, 925 [123 Cal.Rptr. 97, 538 P.2d 225]; *Los Angeles County Employees Assn.* v. *County of Los Angeles* (1976) 61 Cal.App.3d 926, 934 [132 Cal.Rptr. 807]; 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 258, p. 265.)

The primary issue before this court is the same one presented to the trial court by Acme in its petition for writ of mandamus. For purposes of this proceeding, we are to assume BCDC complied with all necessary prerequisites to review Acme's proposed expansion. Our task, as was the trial court's, is to determine whether BCDC's administrative decision objecting to the landfill's proposed expansion was legally supported. The arguments made by the parties are summarized hereafter.

Acme points out that under the McAteer-Petris Act (Gov. Code, § 66600 et seq.), which created BCDC and empowered it to enforce the Bay Plan, BCDC has jurisdiction for all areas extending 100 feet inland from the shoreline of San Francisco Bay. (Gov. Code, § 66610.) Within this area, a BCDC permit is required "to make any substantial change in use of any water, land or structure. . . ." (Gov. Code, § 66632.) It also provides that if an activity is outside BCDC's jurisdiction "any provisions of the [Bay Plan] pertaining thereto are advisory only." (Gov. Code, § 66653.) The McAteer-Petris Act and the Bay Plan were in existence and effect at the time the CZMA was enacted. Since California already had a comprehensive coastal management program in place, the McAteer-Petris Act and the Bay Plan were wholly incorporated as an integral part of the state's federally approved management program under the CZMA. It is undisputed that the site of Acme's proposed expansion is outside the 100-foot shoreline band defined as BCDC's permit jurisdiction under the McAteer-Petris Act. There-

fore, Acme argues that since its site is outside BCDC's permit jurisdiction, any land-use designation reserving Acme's property for water-related industry in the Bay Plan is advisory only and cannot be the basis for a consistency objection under the CZMA. As Acme puts it: "Since the McAteer-Petris Act prohibits BCDC from exercising mandatory land use authority over areas outside its [permit] jurisdiction, as a component of the [state management program], it also bars BCDC from exercising mandatory regulatory authority over Acme's property through the CZMA compliance process."

BCDC claims that Acme's preoccupation with the boundaries of its state law permit jurisdiction draws attention from the real issue in the case. The real issue, BCDC contends, is not the scope of BCDC's permit authority under the McAteer-Petris Act but the scope of BCDC's consistency review authority under the CZMA. BCDC argues that the fact that an activity takes place outside its state law permit jurisdiction has no bearing on whether the activity is subject to consistency review under the CZMA. BCDC emphasizes that under the CZMA, consistency review is triggered when an applicant for a federal permit plans to "conduct an activity *affecting* land or water uses in the coastal zone . . . ." (16 U.S.C. § 1456(c)(3)(A), italics added.) BCDC also claims the state's management program clearly envisioned that BCDC would exercise consistency review over activities outside its state law permit jurisdiction. As BCDC puts it: "The test for CZMA consistency review is whether an activity affects land and water uses within BCDC's permit jurisdiction, not whether the activity itself is in or outside that permit jurisdiction."

The trial court concluded that because the site of Acme's proposed expansion was outside BCDC's permit jurisdiction, the Bay Plan policies for Acme's site were advisory only and BCDC lacked "jurisdiction and authority" to issue a consistency objection. As a supplementary ground for its decision, it found that because the Acme site was designated for a waste disposal site in the Contra Costa general plan and the county's solid waste management plan, the Solid Waste Management and Resource Recovery Act (Gov. Code, § 66700 et seq.) preempted BCDC's consistency review authority under the CZMA.

Although the parties frame the issues in widely divergent ways, we find the principal issue to be whether BCDC acted within the scope of its authority under the CZMA in making a finding that Acme's proposed expansion was inconsistent with the state's management program. More precisely, under the terms of the state's management program, does BCDC's consistency

review authority extend beyond the boundaries of its state law permit jurisdiction? Because the facts guiding our review of this issue are undisputed, we decide it as a matter of law. (*Leslie Salt Co.* v. *San Francisco Bay Conservation etc. Com.* (1984) 153 Cal.App.3d 605, 611 [200 Cal.Rptr. 575].) However, "great weight" is given to the interpretation submitted by BCDC because it is the administrative agency empowered to advance the CZMA's purpose. (*Norman* v. *Unemployment Ins. Appeals Bd.* (1983) 34 Cal.3d 1, 8 [192 Cal.Rptr. 134, 663 P.2d 904].) Courts will generally not depart from such an interpretation unless it is clearly erroneous. (*DeYoung* v. *City of San Diego* (1983) 147 Cal.App.3d 11, 18 [194 Cal.Rptr. 722].)

■ The logical place to begin our analysis is the CZMA itself. Its statutory scheme clearly envisions a federal/state partnership for preserving and protecting the nation's coastal zone "for this and succeeding generations." (16 U.S.C. § 1452(1).) Under this partnership, states retain primary authority for planning and developing their respective coastal areas. This is accomplished through federally approved coastal management plans. In return, federal activities affecting a state's coastal zone are to be conducted "in a manner which is, to the maximum extent practicable, consistent" with the state's management program. (16 U.S.C. § 1456(c)(1).) It is obvious that the state's authority to review federal activities for consistency with its state management plan is an integral part of the statutory scheme. The consistency review provision gives a state the means necessary to see that the standards set out in its coastal management program are taken seriously and implemented. One of the primary objectives of the CZMA is "to encourage the states to exercise their full authority over the lands and waters in the coastal zone." (16 U.S.C. § 1451(i).) Therefore, any interpretation of BCDC's consistency review authority must give due consideration to the fact that the CZMA was designed to *enhance* rather than narrow a state's role in the management of its coastal resources.[4] (See *Southern Pac. Transp.* v. *California Coastal Com'n* (N.D.Cal. 1981) 520 F.Supp. 800, 802-803.)

---

[4]The legislative history of the CZMA bears this out: "[The Act] has as its main purpose the encouragement and assistance of States in preparing and implementing management programs to preserve, protect, develop and whenever possible restore the resources of the coastal zone of the United States. . . . There is no attempt to diminish state authority through federal preemption. The intent of this legislation is to enhance state authority by encouraging and assisting the states to assume planning and regulatory powers over their coastal zones." (Sen.Rep. No. 753, 92d Cong., 2d Sess., reprinted in 1972 U.S. Code Cong. & Admin. News, p. 4776.) This report also emphasized that "local governments do possess considerable authority in the coastal zone. However, frequently their jurisdiction does not extend far enough to deal fully and effectively with the land and water problems of that zone." (*Id.,* at p. 4779.) It was recognized that "[t]he range of problems that arise in the coastal zone . . . often calls for wider jurisdictional range." (*Id.,* at p. 4780.)

The CZMA subjects an activity requiring a federal permit to consistency review if the activity *affects* land or water uses in the coastal zone. (16 U.S.C. § 1456(c)(3)(A).) California's statute mirrors this standard. It authorizes BCDC to provide "any certification" required under CZMA for "any project *outside* the coastal zone that *may have a substantial effect* on the resources within the jurisdiction of [BCDC]." (Pub. Resources Code, § 30330, italics added.) Thus, it seems clear that activities outside the coastal zone, such as Acme's, as well as activities within the coastal zone, were made subject to consistency review by the CZMA.

■ This conclusion does not end the controversy, however, for as we understand it Acme is not arguing that BCDC lacked legislative authorization to exercise consistency review over Acme's proposed expansion. Instead, Acme is arguing that BCDC lacked authority to issue a consistency objection because Acme's proposed expansion was consistent with the "enforceable, mandatory" policies of the state's management program.[5]

It bears repeating that Acme's argument is grounded in the provisions of California's McAteer-Petris Act which grants BCDC permit authority over a 100-foot shoreline band. (Gov. Code, § 66610.) The McAteer-Petris Act further provides that land-use designations in the San Francisco Bay Plan applicable to areas outside BCDC's permit jurisdiction are advisory only. (Gov. Code, § 66653.) Acme's proposed expansion site is not subject to BCDC's permit authority under the McAteer-Petris Act. Therefore, Acme claims, the designation of its site for water-related industrial use in the Bay Plan is an advisory recommendation and has no mandatory legal effect. Acme further argues that the scope of BCDC's authority under the CZMA is no greater than the scope of its authority under the McAteer-Petris Act and the Bay Plan because the state's management program approved by the federal government under the CZMA wholly incorporates the McAteer-Petris Act and the Bay Plan. In essence, Acme is arguing that since the McAteer-Petris Act prohibits BCDC from exercising mandatory land-use authority over areas outside its permit jurisdiction, as a component of the state's management program, it also bars BCDC from exercising authority over Acme's property by issuing a consistency objection.

BCDC asserts that its consistency review objection was within the scope of the authority extended to it under the state's management program. In substantial support of that assertion, BCDC directs our attention to a section of the management program which provides that BCDC "will review Federal

---

[5]The CZMA regulations provide that an applicant's project must be consistent with "enforceable mandatory" policies of the management program. (15 C.F.R. § 930.58(a)(4).)

licenses and permits for activities outside the BCDC segment of the coastal zone (for example, on upland areas *beyond BCDC permit jurisdiction*) . . . ." (Italics added.) The management program observes that normally consistency certification for these activities will not be required *unless* BCDC "determines that the [federal] license or permit activity is likely to significantly affect the BCDC segment of the coastal zone . . . ." Likewise, in its discussion of California's consistency review authority under the CZMA, the court in *Granite Rock Co.* v. *California Coastal Com'n* (N.D. Cal. 1984) 590 F.Supp. 1361, reversed on other grounds (9th Cir. 1985) 768 F.2d 1077, observed that the state's management program intended that consistency review extend to activities taking place beyond BCDC's permit jurisdiction. The court states: "The [CZMA] also seeks to promote cooperation between federal and state agencies engaged in activities within or *affecting* the coastal zone. Thus, the CZMA requires a showing of 'consistency' with state Management Programs of . . . (3) activities for which a Federal permit or license is required and which affect land or water uses in the coastal zone, [citation]. Under the statutory scheme, for example, an activity outside of but affecting the coastal zone by a federal permittee *would not be subject to direct regulation by the state's Management Program but would be subject to 'consistency review' by the state* . . . ." (*Id.,* at p. 1365, italics added.)

In spite of this overwhelming evidence that consistency requirements are imposed on federal activities outside BCDC's state law permit jurisdiction, Acme infers from the last sentence of Government Code section 66653 an intention to shield its activities from scrutiny. The context in which that provision appears reads: "If a function or activity is within the area of [BCDC's] jurisdiction and requires the securing of a permit, the [BCDC] shall exercise its power to grant or deny a permit in conformity with the provisions of this title and with any provisions of the [Bay] plan pertaining to placing of fill, extraction of materials, construction methods and use or change of use of water areas, land or structures. If a function or activity is outside the area of [BCDC's] jurisdiction or does not require the issuance of a permit, any provisions of the [Bay] plan pertaining thereto are advisory only." When used in a statute, words must be construed in context, keeping in mind the nature and obvious purpose of the statute. Various parts of the statute must be harmonized by considering a particular clause or section in the context of the statutory framework as a whole. (*Moyer* v. *Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230 [110 Cal.Rptr. 144, 514 P.2d 1224].)

When viewed in this fashion Government Code section 66653 constitutes a complete statement of legislative intent with respect to the state law

jurisdiction of BCDC to issue permits. The last sentence is incomplete in and of itself and does not constitute an operative expression on the scope of BCDC's consistency review authority under the CZMA. In other words, the Legislature's decision to exclude activities beyond the 100-foot shoreline band from BCDC permit jurisdiction does not evidence an intent to exclude all activities beyond the 100-foot shoreline band from consistency review under the CZMA.

Although both the McAteer-Petris Act and the CZMA focus on the preservation of coastal resources, BCDC's authority under each is not identical. Under the McAteer-Petris Act, BCDC has authority to approve or deny permits within a 100-foot shoreline band. (Gov. Code, § 66610.) The consistency review provision of the CZMA is broader than direct state regulation because it authorizes BCDC to review activities requiring a federal permit if those activities *affect* the coastal zone. (16 U.S.C. § 1456(c)(3)(A).) In examining the state's management plan, we find no indication that the state contemplated narrowing BCDC's consistency review authority to activities requiring a federal permit which are taking place in the shoreline band of BCDC's state law permit jurisdiction.

As a practical matter, any such curtailment of BCDC's consistency review authority under the CZMA would strip BCDC of its power to effectively enforce the management plan. Thus, the enhancement of state control and management of coastal zone resources envisioned by the CZMA would not occur and there would be limited participation in the CZMA regulatory scheme by the state agency charged with protecting San Francisco Bay. Accordingly, we conclude BCDC has authority under the CZMA to conduct a consistency review when a federal agency is considering granting a permit for any activity, *wherever located,* which will have consequences for the bay. Any other interpretation would thwart the purposes of the CZMA.

 When our attention is properly focused on the effect Acme's proposed project will have on the coastal zone,[6] it is evident BCDC's consistency objection must be upheld. Consistency is measured by looking at the effect an activity has in the coastal zone and seeing if that effect is consistent with the state's management program.

The importance of designating and preserving water-related industrial sites is recognized in the McAteer-Petris Act, which is part of the state's management program under the CZMA. In Government Code section 66602,

---

[6]BCDC's management program defines the "coastal zone" as being coextensive with its permit jurisdiction under state law, which is limited by the 100-foot shoreline band.

the Legislature expressly declared that water-related industries are "essential to the public welfare of the bay area." It is also widely recognized that "uncoordinated, haphazard filling in San Francisco Bay threatens the bay itself and is therefore inimical to the welfare of both present and future residents of the area surrounding the bay . . . ." (Gov. Code, § 66601; see *Leslie Salt Co.* v. *San Francisco Bay etc. Com., supra,* 153 Cal.App.3d at pp. 615-617; *Candlestick Properties, Inc.* v. *San Francisco Bay Conservation etc. Com.* (1970) 11 Cal.App.3d 557, 564-565 [89 Cal.Rptr. 897].) The link between reserving suitable sites for water-related industrial use and minimizing the need for harmful bay fill is set forth in Government Code section 66602: "[T]he San Francisco Bay Plan should make provision for adequate and suitable locations for [water-related industries] thereby minimizing the necessity for future bay fill to create new sites for such uses. . . ."

Acme's site is designated in the San Francisco Bay Plan as a water-related industrial site.[7] The McAteer-Petris Act, and therefore the state's management plan, have recognized that these sites have to be preserved to minimize the pressure for future bay fill. Thus, Acme's proposed activity has the effect of creating pressure for harmful bay fill in San Francisco Bay in contravention of the policies expressed in the state's management program.

Moreover, BCDC's conclusion that Acme's expansion could not be approved as an interim use was fully justified by the findings and evidence. There is substantial evidence in the record, and BCDC made findings that the large volume of fill proposed by Acme (70 feet) would create severe problems that would render it impractical to develop the site within a time period that could be considered interim. The constraints placed on developing a site with 70 feet of landfill included: (1) increased engineering costs to construct and drive piling to support structures placed on 70 feet of landfill on top of 80 feet of bay mud; (2) increased costs to design, construct, and maintain facilities that would settle continually over a long period of time;[8] and (3) additional costs to trap and/or dispose of the methane gas manufactured due to the decomposition of the organic content of the waste. Therefore, BCDC concluded that Acme's expansion would place such major limitations on the use of the site that it would significantly detract from its

---

[7]At the hearing held by BCDC on Acme's proposed expansion, an industrial development consultant described Acme's parcel as being in an excellent location for water-related industry; "one of the very few remaining large undeveloped pieces of industrially-zoned real estate with access to deep water."

[8]It was estimated that with 70 feet of landfill, the amount of settlement after 30 years would be between 64 and 104 feet with another 45 percent to take place thereafter.

ability to support water-related industry in the future. This conclusion is fully supported.

■ Acme next contends that BCDC's consistency objection to the proposed expansion does not take into proper consideration the fact that Acme's site is reserved for solid waste disposal by Contra Costa County's general plan and the county's solid waste management plan. Prior to establishment of BCDC by the McAteer-Petris Act, responsibility for the bay region was fragmented among various county and local governments. It is well documented that the bay suffered under this arrangement and serious problems were created by conflicting land use policies. (See Comment, *State Land Use Control: Why Pending Federal Legislation Will Help* (1974) 25 Hastings L.J. 1165, 1176.) To resolve this problem, the California Legislature created BCDC.[9] Special emphasis was placed on the *regional* nature of BCDC. The enacting legislation declares that "while some cities and counties may have prepared detailed master plans for their own bay lands, a governmental mechanism must exist for evaluating individual projects as to their effect on the entire bay . . . ." (Gov. Code, § 66601.) Consequently, it is manifest that the Legislature intended BCDC to "intervene" in land use management practices that had traditionally been left to local governments.

An examination of one of the provisions of the Solid Waste Management and Resource Recovery Act (Gov. Code, § 66700 et seq.) resolves the misconception that its provisions were intended to nullify the consistency requirements under the CZMA. Government Code section 66732 provides that no provision of the act "or any ruling made pursuant thereto" is a limitation on "[t]he power of any state agency in the enforcement or administration of any provision of law which it is specifically permitted or required to enforce or administer . . . ." Certainly there is nothing in this legislation implying any intention to make the county waste management plan preclusive of all state environmental regulation.

Therefore, we conclude that BCDC's consistency review authority under the CZMA does not clash with the rights granted Contra Costa County to reserve a site for a solid waste facility in the county solid waste management plan. (See Gov. Code, § 66780.2, subd. (a).) Although local governmental entities retain the power to plan for their solid waste disposal needs, those

---

[9]One commentator pointed out that "[t]he Bay is in the hands of hundreds of private owners, twenty cities, three counties, one harbor district, the State of California, and the federal government. [Citation.] Each entity has its own proprietary interest; each contributes to the lack of uniform control which the legislature intended to cure by creating BCDC." (Comment, *San Francisco Bay: Regional Regulation for its Protection and Development* (1967) 55 Cal.L.Rev. 728, 763, fn. 180.)

plans must be consistent with the standards set out by the McAteer-Petris Act and the CZMA. The Legislature made it evident that the objective in creating BCDC was to attain uniform control of the entire bay. If particular areas of the region were exempt from BCDC review, the objective of comprehensive planning would be frustrated.

The judgment of the superior court is reversed, and the cause is remanded with directions to vacate the writ and to dismiss Acme's petition for failure to exhaust administrative remedies.

Low, P. J., and King, J., concurred.